Craig **WILLIAMS,** Terrance Williams, Harold Wilson, Mumia Abu Jamal, Robert Wharton, Ronald F. Gibson, Leroy Thomas, Robert Atkins, James Dennis, and All Plaintiffs, Plaintiffs,

v.

James L. **PRICE,** in his official capacity as Superintendent of the State Correctional Institution at Greene; and Martin Horn, in his official capacity as Commissioner of the Pennsylvania Department of Corrections; Defendants.

Civil Action No. 95–338.

United States District Court,
W.D. Pennsylvania.

Nov. 25, 1997.

Jere Krakoff, Pittsburgh, PA, for Plaintiffs.

Kemal Alexander Mericli, Deputy Attorney General, Pittsburgh, PA, for Defendants.

## MEMORANDUM ORDER

BLOCH, District Judge.

Plaintiff's complaint was received by the Clerk of Court on March 7, 1995, and was referred to United States Magistrate Judge Ila Jeanne Sensenich for pretrial proceedings in accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1), and Rules 72.1.3 and 72.1.4 of the Local Rules for Magistrates.

The magistrate judge's report and recommendation, filed on October 8, 1997, recommended that Defendants' Motion for Summary Judgment be granted as to Plaintiffs' claim that strip searches prior to non contact visits with attorneys are unreasonable under the Fourth Amendment; and that they are deprived of equal protection in being denied contact legal visits, in being allowed only one hour of outdoor exercise five days a week, and in being prohibited from playing cards and board games such as checkers and reading religious books during their outdoor exercise time. It further recommended that Defendants' Motion for Summary Judgment be denied as to Plaintiffs' claim that the lack of confidential meeting rooms for legal visits deprives them of their right to privacy under the United States Constitution. The parties were allowed ten (10) days from the date of service to file objections. Service was made on Plaintiffs by delivery to their attorney, Jere Krakoff, and on Defendants. Objections were filed by Plaintiffs on October 20, 1997 and by Defendants on October 22, 1997. Plaintiffs filed a response to Defendants' objections on November 14, 1997. After *de novo* review of the pleadings and documents in the case, together with the report and recommendation and objections thereto, the following order is entered:

AND NOW, this 25th day of November, 1997;

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment is granted as to Plaintiffs' claim that strip searches prior to non contact visits with attorneys are unreasonable under the Fourth Amendment; and that they are deprived of equal protection in being denied contact legal visits, in being allowed only one hour of outdoor exercise five days a week, and in being prohibited from playing cards and board games such as checkers and reading religious books during their outdoor exercise time.

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment is denied as to Plaintiffs' claim that the lack of confidential meeting rooms for legal visits deprives them of their right to privacy under the United States Constitution.

The report and recommendation of Magistrate Judge Sensenich, dated October 8, 1997, is adopted as the opinion of the court.

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

SENSENICH, United States Magistrate Judge.

### I. RECOMMENDATION

It is recommended that Defendants' Motion for Summary Judgment be granted as to Plaintiffs' claim that strip searches prior to non contact visits with attorneys are unreasonable under the Fourth Amendment; that they are deprived of equal protection in being denied contact legal visits, in being allowed only one hour of outdoor exercise five days a week, and in being prohibited from playing cards and board games such as checkers and reading religious books during their outdoor exercise time. It is further recommended that Defendants' Motion for Summary Judgment be denied as to Plaintiffs' claim that the lack of confidential meeting rooms for legal visits deprives them of their right to privacy under the United States Constitution.

### II. REPORT

Plaintiffs, prisoners confined in the capital case unit (death penalty unit) at the State Correctional Institution at Greene brought this action, pro se, under the Civil Rights Act of 1871, 42 U.S.C. § 1983, challenging various conditions of confinement in the death penalty unit. Their request for appointment of counsel was granted and Jere Krakoff, Esq., agreed to represent them. Mr. Krakoff filed an amended complaint and after discovery had been completed Defendants' filed the pending Motion for Summary Judgment.

Plaintiffs concede that they are unable to show they are being denied equal protection in being denied contact legal visits and they have no objection to an order granting Defendants' Motion for Summary Judgment as to this issue.

## ADMINISTRATIVE EXHAUSTION REQUIREMENTS OF THE PRISON LITIGATION REFORM ACT

Defendants argue that any claims for which Plaintiffs have not exhausted available state administrative remedies are not justiciable in the present action by virtue of application of the provisions of the Prison Litigation Reform Act of 1996, ("PLRA"), 42 U.S.C. § 1997e, which provides that, "No action shall be brought with respect to prisons conditions under ... [42 U.S.C. § 1983] until such administrative remedies as are available are exhausted." Defendants contend that the exhaustion of remedies provision of the PLRA is jurisdictional and is an exception to the basic presumption against statutory retroactivity when the statute in question does not speak plainly on the issue.

In Wright v. Morris, 111 F.3d 414 (6th Cir.1997), petition for cert. filed, 111 F.3d 414, 65 U.S.L.W. 2707 (U.S. May 8, 1997) (No. 96–1811), the court held that the language "no action shall be brought" expressed Congress' intention that the act govern only the bringing of new actions, not the disposition of pending cases. The court stated, "Actions brought before the statute was enacted are not affected by the new administrative exhaustion requirement." Id. at 418. The court added that even if the language of the statute did not mandate that administrative exhaustion be required only in actions brought after the effective date of the Act, the Supreme Court's decision in Landgraf v. USI Film Products, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), would do so. The court then noted that there is authority for applying a new statute to pending cases where the plaintiff seeks only future injunctive relief. Section 3626 of the PLRA, which limits prospective relief available, specifically provides that that section "shall apply with respect to all prospective relief whether such relief was originally granted or approved before, on, or after the date of the enactment of this title." Congress did specifically address the question of retroactivity in this section of

the act but did not provide that the exhaustion of remedies requirement would be applied retroactively.

The Sixth Circuit, in *Wright*, is the only court of appeals to have addressed the question of the retroactivity of the exhaustion of remedies requirement. It has held that it is not retroactive and this court should follow it.

It is further noted that the procedures Plaintiffs are challenging are ongoing policies of the Pennsylvania Department of Corrections and the administration at The State Correctional Institution at Greene, some of which are based on alleged security needs. It would be unrealistic to expect there is any chance that those polices would be changed as a result of Plaintiffs utilizing their administrative remedies. To require Plaintiffs to exhaust their administrative remedies would merely delay disposition of the issues presented in this action. The PLRA does not require exhaustion of administrative remedies in cases filed before passage of the act. Therefore, Plaintiffs' claims are not barred by the PLRA.

**STRIP SEARCHES PRIOR TO AND FOLLOWING MEETINGS WITH ATTORNEYS**

■ Plaintiffs challenge Defendants' policy of subjecting all prisoners who are confined on death row at The State Correctional Institution at Greene to strip searches before and after non-contact legal visits. Defendants' "Statement of Material Facts Not in Dispute" explains the search procedure challenged in this action as follows:

18. Before and after non-contact visits with their attorneys, capital inmates at SCI–Greene are given a thorough strip search. Initially, while 2 corrections officer[s] remain outside of the inmate's cell watching through the window in the cell door, the inmate undresses and hands his visiting room clothing, including his shoes, out through a door slot for the officer's inspection. Then he goes through an obligatory sequence of physical movements, which requires him at points to spread his buttocks and to lift his scrotum. His clothing is returned to him and he then dresses in full view of the officers. He extends his hands out through the door

slot [and] is handcuffed in front. The cell door is then unlocked and the inmate is escorted to his legal visit. On his return to his cell the process is functionally reversed. The search should not and does not expose the inmate to view by anyone other than his escort. . . .

19. The L–5 visiting unit is outside of the boundary of the CCU [capital case unit] at Greene. A capital inmate is strip-searched anytime that he is let out of the G–Unit for any reason, not merely legal visiting. . . .

(Defs.' Statement of Material Facts Not in Dispute at 9–10.)

Plaintiffs' brief notes that "all visits between death row prisoners at Greene and their attorneys take place across a solid plexiglass barrier that is framed by a narrow, finely meshed screen." (Pls.' Br. at 2, referring to Price Dep. at 77, App. to Pls.' Br. in Opp'n at 16.) "The inmate sits handcuffed on one side of the visiting booth with the door to the booth locked behind him while his attorney sits on the other side of the barrier." (Pls.' Br. at 2, referring to Price Dep. at 75–78, App. to Pls.' Br. in Opp'n at 14–17.)

The visiting clothes are given to the inmate by the officers. (Price Dep. at 72.) The inmate is escorted from the block to the visiting room by at least one and usually two officers.

The State Correctional Institution at Greene is a new prison, having first been opened in January of 1993. (Price Dep. at 3.) It was sometime during that year that the institution started receiving death row inmates. Inmates in the death row unit are locked inside their cells unless they are showering, exercising, attending the law library, or seeing a counselor, physician or attorney. (Price Dep. at 73.) Inmates being escorted are not permitted to have physical contact with any other inmates who happen to be outside their cells. (Price Dep. at 74.) No inmates are permitted to walk the corridors unescorted. (Price Dep. at 77.) During his deposition, Defendant Price admitted that he did not know of any occasion when anything was passed between a prisoner and a visitor and that it was highly unlikely that anything could be passed. (Price Dep. at

80.) However, he also testified that in June of 1996 they discovered they had to reassess what they were allowing inmates to do in the capital case unit. Inmates in that unit were found to have cellular phones, drugs were found in the unit, and a homemade knife was discovered. They knew that several inmates were involved but they did not know how many. At the time of the deposition on March 14, 1997 it had not been determined which inmate had had the knife. Those incidents required them to review in toto how they were operating the unit. (Price Dep. at 99–102.)

Any analysis of prisoners' rights under the Fourth Amendment of the Constitution not to be subjected to unreasonable body cavity searches must start with *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). In that case the Court upheld all of the challenged practices at the Metropolitan Correctional Center (MCC) in New York City, which housed primarily pretrial detainees. The Court admitted that the visual body cavity searches which were conducted after every contact visit with persons outside the institution gave it the most difficulty. Corrections officials had testified that the searches were necessary both to discover and to deter the smuggling of weapons, drugs, and other contraband into the institution. The District Court had prohibited the body cavity searches, absent probable cause to believe that the inmate was concealing contraband. The Court of Appeals had affirmed because there had been only one instance in the MCC's short history where contraband was found during a body cavity search. However the Supreme Court, assuming that inmates retain some Fourth Amendment rights upon commitment to a corrections facility, concluded that the searches did not violate the Fourth Amendment. The Court recognized that a detention facility is a unique place fraught with serious security dangers.

> Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence. And inmate attempts to secrete these items into the facility by concealing them in body cavities are documented in this record, and in other cases. That there has been only one instance

where an MCC inmate was discovered attempting to smuggle contraband into the institution on his person may be more a testament to the effectiveness of this search technique as a deterrent than to any lack of interest on the part of the inmates to secrete and import such items when the opportunity arises.

*Wolfish,* 441 U.S. at 559, 99 S.Ct. 1861 (citations and footnote omitted). Factually, *Wolfish* is distinguishable from this case. In that case the searches were required after an inmate had had a contact visit with a person from outside the institution. In this case the searches are required when a prisoner has had a non contact visit with his lawyer.

The proscription against unreasonable searches and seizures in the Fourth Amendment of the United States Constitution is enforceable against the states through the Fourteenth Amendment. *Ker v. State of California,* 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963). Prisoners do not have a right to privacy in their cells. Therefore, the Fourth Amendment does not apply to cell searches. *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). However, some courts hold that prisoners still retain a limited right to body privacy. *Covino v. Patrissi,* 967 F.2d 73, 78 (2d Cir.1992); *Cornwell v. Dahlberg,* 963 F.2d 912, 916 (6th Cir.1992).

In *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), the Court addressed the standard of scrutiny to be applied to determine whether a prison regulation violates the constitutional rights of prisoners. It rejected the strict scrutiny analysis the court of appeals had used to determine the constitutionality of regulations relating to inmate marriages and inmate-to-inmate correspondence and held that a lesser standard would be applied. The Court announced the following standard:

> [W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests. In our view, such a standard is necessary if "prison administrators ..., and not the courts,

[are] to make the difficult judgments concerning institutional operations." Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration. The rule would also distort the decisionmaking process, for every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand. Courts inevitably would become the primary arbiters of what constitutes the best solution to every administrative problem, thereby "unnecessarily perpetuat[ing] the involvement of the federal courts in affairs of prison administration."

*Id.* at 89, 107 S.Ct. 2254 (citations omitted). The Court then identified four factors to consider in determining the reasonableness of a regulation:

First, there must be a "valid, rational connection" between the prison regulation and the legitimate governmental interest put forward to justify it. Thus, a regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational. Moreover, the governmental objective must be a legitimate and neutral one. . . .

A second factor relevant in determining the reasonableness of a prison restriction, as *Pell [v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974) ] shows, is whether there are alternative means of exercising the right that remain open to prison inmates. Where "other avenues" remain available for the exercise of the asserted right, courts should be particularly conscious of the "measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation."

A third consideration is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally. In the necessarily closed environment of the correctional in-

stitution, few changes will have no ramifications on the liberty of others or on the use of the prison's limited resources for preserving institutional order. When accommodation of an asserted right will have a significant "ripple effect" on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials.

Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation. By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an "exaggerated response" to prison concerns. This is not a "least restrictive alternative" test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint. But if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard.

*Id.* at 89–91, 107 S.Ct. 2254 (citations omitted).

In *Washington v. Harper,* 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990), the Court applied the *Turner* factors to the involuntary administration of antipsychotic drugs to an inmate. In upholding the policy of the prison, the Court stated:

[T]he proper standard for determining the validity of a prison regulation claimed to infringe on an inmate's constitutional rights is to ask whether the regulation is "reasonably related to legitimate penological interests." This is true even when the constitutional right claimed to have been infringed is fundamental, and the State under other circumstances would have been required to satisfy a more rigorous standard of review. . . .

Our earlier determination to adopt this standard of review was based upon the need to reconcile our longstanding adherence to the principle that inmates retain at least some constitutional rights despite incarceration with the recognition that pris-

on authorities are best equipped to make difficult decisions regarding prison administration. These two principles apply in all cases in which a prisoner asserts that a prison regulation violates the Constitution, not just those in which the prisoner invokes the First Amendment. We made quite clear that the standard of review we adopted in *Turner* applies to all circumstances in which the needs of prison administration implicate constitutional rights. *Harper,* 494 U.S. at 223–24, 110 S.Ct. 1028 (citations omitted).

Other courts have applied *Turner* to cases challenging body search procedures. In *Covino v. Patrissi,* 967 F.2d 73 (2d Cir.1992), the court affirmed an order of the district court denying a motion for a preliminary injunction challenging the visual body cavity search procedure employed in a Vermont state prison. The plaintiff alleged that he was randomly selected for a search of his cell, including a visual body cavity search. When he refused to consent to the search he was punished. The district judge adopted the Report and Recommendation of a magistrate judge who had conducted an evidentiary hearing. The magistrate judge found that eighty-five percent of the inmates at the prison had violence as a feature of their background and eighty percent had drug and/or alcohol abuse backgrounds.

The court of appeals noted that the prisoner has the burden to show that a challenged prison regulation is unreasonable. The superintendent of the institution had testified that on occasion the searches conducted at the institution had uncovered drugs and that occasionally contraband and drugs were found secreted in an inmate's rectum. Based on this evidence, together with the high number of inmates who had violence as a feature of their backgrounds and who had drug and/or alcohol abuse backgrounds, the institution had demonstrated that the random visual body cavity searches were reasonably related to its legitimate penological interests.

As to the second and third *Turner* factors, (alternative means of exercising the rights in question and the effect of accommodation of the asserted constitutional right on guards and other inmates) the court found that although inmates do possess a limited right to bodily privacy, some aspects of the right must yield to searches for contraband, so that prison administrators may maintain security and discipline in their institutions. The court stated, "There do not appear to be any alternative means that would allow Covino to exercise his limited bodily privacy rights and at the same time allow NWSCF to achieve fully the effectiveness of the challenged searches." *Covino,* 967 F.2d at 79.

As to the fourth *Turner* factor, whether there are reasonable alternatives, the court rejected the plaintiff's argument that the federal regulations, which authorize visual searches based upon a "reasonable belief" standard, was required, noting that the fourth factor is not a "least restrictive alternative" test. The court, in compliance with *Turner,* deferred to the expertise of the state prison officials. *Id.* at 79–80, 107 S.Ct. 2254.

The court commented that its decision was not contrary to its earlier opinion in *Hurley v. Ward,* 584 F.2d 609 (2d Cir.1978). In that case it had affirmed the issuance of a preliminary injunction which prohibited visual anal and genital searches of Michael X. Hurley, without probable cause. Its holding in that case was based on a record that contained evidence that Hurley had been subjected to physical and verbal abuse during the searches.

A distinction can be made between this case and *Covino* in that in *Covino* a magistrate judge had conducted an evidentiary hearing. In this case the motion before the court is a Motion for Summary Judgment. However in both cases the inmates in question were high security inmates with violence as a feature of their background. In both cases contraband had been found in the relevant unit of the prison. The fact that at Greene no contraband or drugs have actually been found secreted in an inmate's rectum as they had in *Covino* does not seem to be a critical difference. It is noted that Greene is a fairly new prison and prison officials are not required to wait until they have experienced serious security problems to take security measures. Although in *Covino* an evidentiary hearing had been conducted while there has been no evidentiary hearing in this

case, *Covino* lends support to the reasonableness of the searches.

In *Cornwell v. Dahlberg,* 963 F.2d 912 (6th Cir.1992), the court reversed a judgment entered on a jury verdict for the plaintiff and remanded for a new trial on the plaintiff's claim that he had been improperly subjected to a strip search following his participation in a sit-in in the prison, protesting a new policy. The court determined that the district court had erred in charging the jury. The court had failed adequately to instruct the jury to find some valid, rational connection between the prison policy and a legitimate penological interest as required by *Turner.* Further, it had failed to inform the jury of the need to defer to prison officials in establishing these policies.

In *Franklin v. Lockhart,* 769 F.2d 509 (8th Cir.1985), the district court reversed the grant of a summary judgment for the defendant prison officials where the plaintiff had not had an evidentiary hearing on his claim that he was strip searched twice a day while he was confined to his cell with access to only staff-issued meals and tissue. The court found that the defendants' mere declaration that the searches occurred "according to policy" to maintain security and prevent the flow of contraband did not clearly establish the defendants' right to judgment on this claim. The court noted that the need for the particular search must be balanced against the invasion of personal rights that the search entails. After remand, a magistrate judge conducted an evidentiary hearing and recommended that the prison officials be enjoined from conducting visual body cavity (VBC) strip searches within view of other inmates not being searched simultaneously. The district judge found that security concerns justified the searches and that the manner in which the searches were being conducted fell within the wide-ranging discretion granted to prison officials in matters relating to institutional security. The Court of Appeals affirmed. *Franklin v. Lockhart,* 883 F.2d 654 (8th Cir.1989). The court commented that the inmates in Barracks 16, who were administratively segregated, were considered by prison officials to be the most serious security threat of any inmates except those on

death row. The court recognized that the intrusiveness of VBC searches is significant and inmates were searched even if they did not leave their cells. However, there was a history of contraband in the building and the district court had found that guards, inmate porters, and other outsiders occasionally gave the inmates contraband. The inmates could fashion weapons from the fixtures in their cells. The court added, "Moreover, with regard to both [Barracks], prison officials testified that whenever inmates are taken out of the general prison population and are placed in a more restrictive environment, the inmates become more likely to smuggle contraband." *Id.* at 656. In *Franklin,* the Court of Appeals had remanded the case for an evidentiary hearing, which had been held by a magistrate judge who recommended that the prison officials be enjoined from conducting visual body cavity searches within view of other inmates not being searched. The district judge did not adopt that recommendation but found that security concerns justified the searches and that the manner in which they were being conducted was within the discretion of the officials. The Court of Appeals affirmed and noted that the inmates were considered to be the most serious security threat of any inmates except *those on death row.* In that case there was a history of contraband in the building. In spite of the fact that the CCU at Greene has not experienced serious contraband this case also supports the searches at Greene.

Similarly, in *Michenfelder v. Sumner,* 860 F.2d 328 (9th Cir.1988), the court affirmed a judgment upholding visual body cavity strip searches in which unclothed male inmates could be viewed by female guards. The searches were conducted every time a Unit Seven inmate left or returned to the unit, as well as after movement under escort within the unit, such as for sick call, recreation, disciplinary hearings, and visits. The searches were visible to the tier's other prisoners, and to guards, including female officers. The court applied the *Turner* standards. It noted that not all four factors will be relevant to each case. "For example, the second *Turner* factor—availability of other avenues for exercising the right infringed upon—is much more meaningful in the first

amendment context than the fourth or eighth, where the right is to be free from a particular wrong." *Id.* at 331 n. 1. The court noted that *Turner* required it to accord great deference to prison officials' assessments of their interests. The court noted that the frequency of strip searches in Unit Seven appeared to be very high. Prisoners were searched both coming and leaving their cells, even when traveling only within the unit while under escort and in chains at all times. The court stated:

> However, so long as a prisoner is presented with the opportunity to obtain contraband or a weapon while outside of his cell, a visual strip search has a legitimate penological purpose. Michenfelder, who bears the burden of showing NSP [Nevada State Prison] officials intentionally used exaggerated or excessive means to enforce security, has failed to demonstrate that the searches at issue here were conducted in the absence of such opportunities.
>
> *Justification:* The fact that Unit 7 houses the state's most difficult prisoners gives rise to a legitimate governmental security interest in procedures that might be unreasonable elsewhere. In addition, testimony and physical evidence before the district court substantiated several incidents in which contraband and homemade weapons were confiscated from Unit Seven inmates.

*Id.* at 332–33.

In *Hay v. Waldron,* 834 F.2d 481 (5th Cir.1987), the court affirmed an order denying the plaintiff's motion for a preliminary injunction in which he challenged the state's strip search procedures for administrative segregation inmates. The court rejected the plaintiff's argument that the magistrate who had conducted the evidentiary hearing should have applied a "least restrictive means" test in balancing the state's security needs against the inmates' privacy interests and that the officials must have probable cause for a visual body cavity search. The court noted that courts should accord broad deference to prison administrators regarding the reasonableness of the scope, the manner, the place and the justification for a particular policy:

> If a policy is reasonably related to legitimate security objectives and there is no substantial evidence to indicate that prison officials have exaggerated their response to security considerations, courts ordinarily should defer to prison administrators' expertise.

*Id.* at 486. The court noted that the strip search policy had evolved in response to the rising tide of violence which flooded Texas prison systems in their recent past. It concluded that the record contained substantial evidence that the strip search policy reasonably related to legitimate penalogical objectives and there was no evidence that it was an exaggerated response by prison officials to conditions within the prison system.

Another case which upheld visual body cavity searches after an extensive hearing is *Arruda v. Fair,* 710 F.2d 886 (1st Cir.1983). The prison was the only maximum security prison in Massachusetts designed to hold the inmates who pose the greatest risks to society and to each other. Second, the special security area in question was a "prison within a prison," designed to hold the most dangerous inmates. *Id.* at 887. Further, the record bore out a lengthy history of prison contraband problems, including prisoner possession of both drugs and weapons. Guards themselves had been found to be involved in smuggling contraband, including drugs, to prisoners.

In *Justice v. City of Peachtree City,* 961 F.2d 188 (11th Cir.1992), the court upheld a strip search of a fourteen year old girl who had been arrested on a charge of loitering and truancy because the arresting officers had a basis for believing that she was hiding contraband on her person. Because the officers had a reasonable suspicion, the search did not violate the Fourth Amendment. In that case the strip search consisted of requiring the girl to remove all of her clothes except her panties.

In *Thompson v. City of Los Angeles,* 885 F.2d 1439 (9th Cir.1989), the court upheld the grant of summary judgment against the plaintiff who had been subjected to a strip search after his arrest on charges of grand theft of an automobile, a felony. The court stated, "While it is difficult to place grand

theft auto, a crime punishable as a felony offense under California law, ... on the continuum established by prior cases, we believe that, on balance, such an offense is sufficiently associated with violence to justify a visual strip search." *Id.* at 1447.

The one other decision by a court of appeals upholding a motion for summary judgment entered by the district court is *Rickman v. Avaniti*, 854 F.2d 327 (9th Cir.1988). That was a *pro se* case in which the plaintiff challenged the state policy of requiring prisoners in the administrative segregation unit to submit to visual strip and body cavity searches when leaving their cells. Administrative segregation was the highest custody status that could be assigned an inmate, and was used for inmates requiring close supervision. The plaintiff had not been allowed to leave his cell to go to the exercise yard because he refused to submit to a visual strip search. In his affidavit the warden had explained that the search policy was instituted to maintain the high security required of the administrative segregation unit.

While there do not appear to be any Circuit cases invalidating visual body cavity searches of convicted prisoners in high security institutions, there are many cases holding that visual body cavity searches of persons arrested for misdemeanors without any reasonable suspicion that they were likely to be carrying or concealing weapons or drugs, violate the Fourth Amendment.

In *Chapman v. Nichols*, 989 F.2d 393 (10th Cir.1993), the court affirmed an order denying the sheriff's motion for summary judgment on the ground of qualified immunity. The court stated:

> In this case, it is undisputed that plaintiffs were arrested for minor traffic violations and were awaiting bail, that jail officials had no reasonable suspicion that these particular arrestees were likely to be carrying or concealing weapons or drugs, and that plaintiffs were searched solely because the blanket policy required all detainees to be subjected to a strip search. Every circuit court, including our own, which has considered the above circumstances under the *Wolfish* balancing test

has concluded that a search under these circumstances is unconstitutional.

*Id.* at 395.

In *Jones v. Edwards*, 770 F.2d 739 (8th Cir.1985), the court held that the district court had erred in denying the plaintiff's motion for judgment notwithstanding the verdict where he had been subjected to a visual strip search after his arrest on a charge of violating the leash law. The court noted that the offense with which the plaintiff was charged was not one to inspire officers with the fear of introducing weapons or contraband into the holding cell. The plaintiff had been arrested early in the morning at his home. Officers were with him every moment after they read him the warrant. They watched him dress and go to the bathroom. The court concluded that security could not justify the blanket deprivation of rights which had occurred in that case.

In *Mary Beth G. v. City of Chicago*, 723 F.2d 1263 (7th Cir.1983), the court affirmed a partial summary judgment for the plaintiffs, holding that the City's strip search policy, pursuant to which all women arrested and detained in City lockups were subjected to a visual body cavity search, regardless of the charges against them and without regard to whether the arresting officers or detention aids had reason to believe that they were concealing weapons or contraband on their persons, violated the Fourth Amendment. Each of the plaintiffs had been subjected to a strip search, including a visual body cavity search, after being arrested for a misdemeanor (a traffic violation or a charge of disorderly conduct). The court stated, "[P]laintiffs-appellees are minor offenders who were not inherently dangerous and who were being detained only briefly while awaiting bond." *Id.* at 1272 (footnote omitted). The court described the searches as "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission." *Id.*

## ANALYSIS OF STRIP SEARCH POLICY

During oral argument Mr. Mericli argued that the strip searches conducted at the State Correctional Institution at Greene are

not demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission because of the manner in which they are conducted. They are done in the privacy of the inmate's cell and are observed by no one other than one or two officers. Plaintiffs do not contend that the strip searches are conducted in a malicious way or in a place that exposes them to the view of persons other than the guards who conduct the searches. (Pls.' Br. at 10.) However, I believe that although the searches probably are not terrifying, all of the other adjectives are accurate. The question here is whether they violate the Fourth Amendment. Defendants argue they are necessary for security—to prevent inmates from transporting contraband between their cells and the visiting room. Plaintiffs point out that it is extremely unlikely that an inmate would attempt to transport contraband from his cell to a non contact visit with an attorney and suggest that the visiting room booth could easily be inspected after the visit to make sure the inmate has not left any possible contraband in the booth. Defendants suggest that an inmate could obtain contraband from another inmate while walking down a corridor and that is why the second search is needed. As Plaintiffs argue, it is difficult to imagine how a shackled inmate, escorted by one or two officers, could obtain contraband from another shackled inmate, also escorted by one or two officers. However, it cannot be denied that the searches are related to legitimate penological interests. The question is whether there is a " 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it" or whether the logical connection between them is "so remote as to render the policy arbitrary or irrational." *Turner*, 482 U.S. at 89, 107 S.Ct. 2254. Although Plaintiffs make reasonable arguments that the searches are not necessary, they have produced no evidence that they are "so remote as to render the policy arbitrary or irrational."

Every court of appeals that has considered a similar search policy has upheld it. While in most of those cases there was evidence that the searches had been instituted in response to serious security problems, it is noted that the institution here is a new one and in *Wolfish* the Supreme Court suggested that the fact that there had been only one instance where an MCC inmate was discovered attempting to smuggle contraband into the institution on his person may be more a testament to the effectiveness of this search technique as a deterrent than to any lack of interest on the part of the inmates to secrete and import such items when the opportunity arises. Defendants are not required to wait until a problem develops to respond. Further, Defendant Price testified that contraband, including a homemade knife, has already been found in the capital case unit and it had not been determined how it got there.

The cases cited by Plaintiffs in which strip searches were found to violate the Fourth Amendment were cases in which persons had been arrested for minor offenses, under circumstances which did not provide any basis to believe they possessed any contraband or weapons. Those cases are distinguishable from the facts here, where Plaintiffs are all prisoners in a death penalty unit of a state penitentiary.

As offensive as the strip searches are, because they occur in a unit of a prison which is inhabited by prisoners subject to the death penalty, and since they have a rational connection to a legitimate governmental interest—preventing contraband from coming into the prison and being transported within the prison—the searches do not violate the Fourth Amendment of the United States Constitution and it is recommended that as to this claim Defendants' Motion for Summary Judgment be granted.

**THE LACK OF CONFIDENTIAL MEETING ROOMS FOR LEGAL VISITS**

Plaintiffs assert that the practice of requiring them to meet and confer with attorneys in settings that enable guards and other persons to overhear their confidential discussions entrenches upon their right to privacy. Defendants do not dispute that the visiting booths are not sound proof. It is their opinion that Plaintiffs do not have a right under the Constitution to confidential communica-

tions with counsel. In their Statement of Material Facts Not in Dispute they state:

24. It is not disputed by defendants that the L–5 visiting booths at SCI–Greene are not sound proof. Audible sound emerges during the course of conversations within the booth, which can be heard by persons within the visiting room behind the attorney's booth or in the corridor behind the inmate booth. It is not disputed that it is possible for a person in the visiting room to discern what is being said by an attorney in the last booth—in the row which is ordinarily used for such visits because of its out of the way placement. (Deposition of Gallentine at 31–32)—despite the person being required to stay behind a rope restricting access to the immediate outside corridor while a visit is taking place. It is unclear if the inmate[']s side of the conversation may also be overheard in such circumstances. It is submitted that, while he remains in the visiting room guard booth, a correction[s] officer cannot hear anything from the visiting booths. This corrections officer, however, periodically leaves his station in the guard booth to patrol the visiting room. Deposition of Price at 137. Visitors are sometimes waiting in the visiting room while other visits, including attorney visits occur. Deposition of Price at 90—92, 94, 137.

Plaintiffs do not ground this claim on their right to access to court under the Fourteenth Amendment of the United States Constitution because they cannot show injury as now required by *Lewis v. Casey*, 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). Defendants do not claim any security or institutional need to be able to overhear inmates' conversations with their attorneys. In fact, during oral argument Mr. Mericli advised that when the visiting area was originally designed it was the intention that conversations not be overheard. However, after it was put into use it was discovered that conversations could be overheard.

While Defendants admit that comments by an attorney can be heard by others in the visiting room they do not either admit or deny that statements made by inmates can be heard. They admit only that audible sounds by an inmate can be heard. Plaintiffs have submitted a Declaration by Rachel H. Wolkenstein, an attorney admitted to practice in the State of New York who is one of the attorneys for Mumia Abu–Jamal, an inmate at Greene, representing him on his collateral appeals of his conviction for first degree murder and death sentence. On several occasions when another death row inmate had a visitor she was able to hear the conversation between both the inmate and his visitor although the doors were closed in both the booth she was in and the booth of the other inmate.

While various courts have generally recognized that the United States Constitution assures prisoners a right to privacy in their communications with counsel, it is a right which has not been extensively analyzed. This may be because prisoners who are awaiting trial or who are appealing their conviction have a right to counsel under the Sixth Amendment of the Constitution. *Douglas v. People of State of California*, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963). However, they do not have a constitutional right to counsel under the Sixth Amendment after their first appeal of right. *Pennsylvania v. Finley*, 481 U.S. 551, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987). But until the decision of *Lewis v. Casey*, 518 U.S. 343, 116 S.Ct. 2174, 2181–82, 135 L.Ed.2d 606 (1996), held that to show a denial of access to court under the Fourteenth Amendment of the United State Constitution a prisoner must show actual injury to a specific legal claim which sought to vindicate "basic constitutional rights," prisoners had a recognized right to privacy in communications with attorneys through their right of access to court. In *Bieregu v. Reno*, 59 F.3d 1445, 1456 (3d Cir.1995), in holding that a pattern and practice of opening a prisoner's properly marked incoming court mail outside his presence impinged on his constitutional rights to free speech and court access the court stated:

[I]nterference with attorney mail probably infringes the right of court access even more than interference with court mail, whether the correspondence relates to a criminal conviction, a subsequent collateral proceeding, or a civil suit to protect an

inmate's constitutional rights. Of all communications, attorney mail is the most sacrosanct. Thus, although the Sixth Amendment is not recognized as the repository for such a shield in civil matters, *see Finley, supra*, the right of court access guarantees the privacy of attorney-client communications.

With the limitations on access to court claims imposed by *Lewis*, prisoners who are not awaiting trial or disposition of their first appeal of right are now reduced to establishing a right to confidential communications with counsel through establishing a right to privacy protected by the Constitution. There is authority for such a right but it has not yet been clearly defined.

In *Bieregu* the court declined to address the right of privacy because the plaintiff had not raised it. However the court stated:

> The Supreme Court has recognized that the right to privacy survives incarceration. *Turner*, 482 U.S. at 95–99, 107 S.Ct. at 2265–67. *See also Monmouth County Correctional Inst. Inmates v. Lanzaro*, 834 F.2d 326, 334 (3d Cir.1987), *cert. denied*, 486 U.S. 1006, 108 S.Ct. 1731, 100 L.Ed.2d 195 (1988). Although authorized by § 540.18, routine reading of purely personal letters from friends and family, those daily expressions of affection and love, may implicate an inmate's right to privacy. Certainly personal information in the hands of prison officials may result in ridicule, harassment, and retaliation.... Similarly, opening legal mail outside the presence of an inmate, giving rise to the reasonable inference that such mail is read, may also implicate the right to privacy.

*Bieregu*, 59 F.3d at 1456 n. 5.

In *Johnson–El v. Schoemehl*, 878 F.2d 1043 (8th Cir.1989), the court affirmed the denial of the defendants' Motion for Summary Judgment based on the defense of qualified immunity as to the plaintiffs' claim that they were required to meet with their attorneys in public areas of the jail where their conversations could be overheard by guards and other prisoners. The plaintiffs were pretrial detainees for whom the Sixth Amendment right to counsel was available but the court also referred to the right to privacy. The court stated: "'[s]uch conditions impede the detainees' ability to prepare for trial, jeopardize the confidentiality of their attorney-client communications and invade their right to privacy.'" *Id.* at 1053 (quoting *Moore v. Janing*, 427 F.Supp. 567, 576 (D.Neb.1976)).

In *Cantor v. Supreme Court of Pennsylvania*, 353 F.Supp. 1307 (E.D.Pa.), *aff'd*, 487 F.2d 1394 (3d Cir.1973), the court granted a motion by the defendants to dismiss a complaint filed by attorneys purporting to represent a class consisting of all attorneys in Pennsylvania challenging disciplinary rules adopted by the Supreme Court of Pennsylvania as in violation of the United States Constitution. In discussing the plaintiffs' argument that the rules infringed on the attorney-client relationship the court stated:

> Further, the Rules do not infringe in any way on the inviolability of the attorney-client relationship; rather, they merely force an attorney to comply with the reasonable requirements of the Pennsylvania Supreme Court in order to continue in the active practice of law. Accordingly, even though the constitutional right to privacy blankets the attorney-client relationship, the summary suspension provisions do not unreasonably impinge on that right thereby depriving a client of his choice of counsel.

*Id* at 1319.

Defendants cite *Lopez v. Robinson*, 914 F.2d 486 (4th Cir.1990), in support of their claim that Plaintiffs do not have a constitutional right to privacy in their communications with counsel. However, in that case the court merely held that the individual defendants were entitled to qualified immunity as to the plaintiffs' claim that the absence of soundproofing materials in the attorney-client visiting room plus the presence of a uniformed officer outside the door rendered the arrangement insufficient to protect their right to privacy, free access to counsel, and confidentiality of attorney-client communications. The prison regulations provided that "all conversations between the inmate and attorney may be visually observed by supervising officers, but not overheard, listened to,

618

or recorded in any manner." The plaintiffs based their damage claims on two affidavits by inmates, one stating the observing officer once sat so close that he could hear the inmate's conversation with his lawyer and another in which a paralegal offered similar affidavit testimony. The court stated:

> Assuming that the inmates have alleged a violation of a clearly established constitutional right of access to the courts, no record evidence establishes that any of the named defendants were personally involved with these incidents of alleged constitutional deprivations. Because liability under § 1983 cannot be premised on *respondeat superior,* the prison officials are entitled to summary judgment on this claim.

*Id.* at 494 (citations omitted). This case does not support Defendants' argument that Plaintiffs do not have a right under the Constitution to private communications with counsel.

In *Nixon v. Administrator of General Services,* 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977), the Court appears to have recognized a constitutional right to privacy. The Court upheld an act passed by Congress which directed the Administrator of General Services to take custody of the presidential papers and tape recordings of former President Richard M. Nixon and promulgate regulations that provided for the orderly processing and screening by Executive Branch archivists of such materials for the purpose of returning to Nixon those that were personal and private in nature and determine the terms and conditions upon which public access may eventually be had to those materials that were retained. The Court stated:

> In sum, appellant has a legitimate expectation of privacy in his personal communications. But the constitutionality of the Act must be viewed in the context of the · limited intrusion of the screening process, of appellant's status as a public figure, of his lack of any expectation of privacy in the overwhelming majority of the materials, of the important public interest in preservation of the materials, and of the virtual impossibility of segregating the small quantity of private materials without comprehensive screening. When this is combined with the Act's sensitivity to appellant's legitimate privacy interests, the unblemished record of the archivists for discretion, and the likelihood that the regulations to be promulgated by the Administrator will further moot appellant's fears that his materials will be reviewed by "a host of persons," we are compelled to agree with the District Court that appellant's privacy claim is without merit.

*Id.* at 465, 97 S.Ct. 2777 (citations omitted).

In *Houchins v. KQED, Inc.,* 438 U.S. 1, 5 n. 2, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978), the Court recognized that inmates in jails, prisons or mental institutions retain a fundamental right of privacy.

In *Woods v. White,* 689 F.Supp. 874 (W.D.Wis.1988), *aff'd,* 899 F.2d 17 (7th Cir. 1990), the court found that the plaintiff, a prisoner, had a constitutional right to privacy in his medical records and denied the defendant's motion for judgment on the pleadings as to the plaintiff's claim that the defendants, medical service personnel, had discussed with non-medical staff and other inmates the fact that he had tested positive for the AIDS virus. The court noted that in *Whalen v. Roe,* 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977), the Court had identified two different kinds of privacy interests: The "'interest in independence in making certain kinds of important decisions,' and the interest 'in avoiding disclosure of personal matters.'" *Id.* at 875, 97 S.Ct. 869 (citations omitted). The court refused to find that the defendants were entitled to a defense of qualified immunity, stating: "I think it would have been clear to a competent public official in 1986 that individuals had a constitutional right to privacy in information relating to AIDS." *Id.* at 877, 97 S.Ct. 869.

There appears to be a right to privacy protected by the United States Constitution, although the courts have not clearly identified the precise source of that right or the extent of it. In *Whalen v. Roe,* 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977), a case in which the Court held that a New York act which required that the names and addresses of all persons who had obtained, pursuant to a doctor's prescription, certain drugs for

which there is both a lawful and an unlawful market, did not violate the Constitution, the Court identified several possible sources of the right to privacy. It seemed to suggest that the primary source is the Fourteenth Amendment. The Court stated:

> Language in prior opinions of the Court or its individual Justices provides support for the view that some personal rights "implicit in the concept of ordered liberty" are so "fundamental" that an undefined penumbra may provide them with an independent source of constitutional protection. In *Roe v. Wade*, however, after carefully reviewing those cases, the Court expressed the opinion that the "right of privacy" is founded in the Fourteenth Amendment's concept of personal liberty,
>
>> This right of privacy, whether it be founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon state action, *as we feel it is*, or, as the District Court determined, in the Ninth Amendment's reservation of rights to the people, is broad enough to encompass a woman's decision whether or not to terminate her pregnancy.

*Whalen*, 429 U.S. at 598–599 n. 23, 97 S.Ct. 869 (quoting *Roe v. Wade*, 410 U.S. 113, 152–53, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973)) (emphasis in original) (citations omitted). The Court also noted that Professor Kurland had identified in an article in the University of Chicago Magazine 7, 8 (autumn 1976), three facets of the right of privacy. The first is the right of the individual to be free in his private affairs from governmental surveillance and intrusion. The Court recognized that this right is directly protected by the Fourth Amendment. The second is the right of an individual not to have his private affairs made public by the government and the third is the right of an individual to be free in action, thought, experience, and belief from governmental compulsion. These last two facets were the ones applicable to that case, which the Court indicated were protected by the Fourteenth Amendment's concept of personal liberty. *Id.* at 599 n. 24, 97 S.Ct. 869. The Court also noted that in *Griswold v. State of Connecticut*, 381 U.S. 479, 483, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), Justice Douglas, writing for the Court, stated, "[T]he First Amendment has a penumbra where privacy is protected from governmental intrusion." *Id.* at 599 n. 25, 85 S.Ct. 1678.

Now that the constitutional right of access to court is no longer available to prisoners to preserve the confidentiality of their communications with their counsel unless they can meet the difficult test of injury set forth in *Lewis*, or unless the Sixth Amendment is available, they will reasonably look to the right of privacy to assure their right to confidential communications with counsel. This seems to be an appropriate application of the right of privacy. Therefore it is recommended that as to this claim Defendants' Motion for Summary Judgment be denied.

**DISPARITY BETWEEN THE AMOUNT OF OUTDOOR RECREATION TIME FOR DEATH ROW INMATES AT GREENE AND GRATERFORD**

Plaintiffs assert that they are deprived of equal protection under the Fourteenth Amendment of the United States Constitution because they are afforded only one hour a day of outdoor recreation while the majority of death row inmates at Graterford are allowed two hours of daily recreation for "good behavior". Defendants' "Statement of Material Facts Not In Dispute", paragraphs 26 and 27, explains the exercise policies at the prisons as follows:

> 26. Exercise for CCU inmates at Greene is one hour per day, five days per week, the minimum for such inmate required by 61 P.S. 101, as amended. It is now the same for capital inmates at SCI–Pittsburgh and has been since the late fall of 1996, a change related to increasing the security level of the prison. Before that it was two hours per day 7 days a week. Deposition of Salvay at 31–33. At Graterford, 60–75% of the death row inmates have the maximum of 2 hours exercise 5 days per week by reason of good behavior. Deposition of Knauer at 61. Deputy Commissioner Fulcomer testified that the DOC wanted to bring Pittsburgh in line with the law and so ensure consistency in policy among prison capital units. Deposition of Fulcomer at 40–41.

27. According to Superintendent Price concerns of logistics and good correctional management (especially considering the number of staff involved) require the one hour minimum at SCI–Greene in view of the fact that it has the largest population of capital inmates of any state prison. Deposition of Price at 130–136. *See also,* deposition of Miller at 33—35 (staffing limitations require exercise to be completed by 2 P.M.); Deposition of Gallentine 83–84.

In *Hosna v. Groose,* 80 F.3d 298 (8th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 164, 136 L.Ed.2d 107 (1996), the court recognized that the plaintiffs, inmates housed in the administrative segregation unit, who claimed they were denied equal protection because they enjoyed fewer privileges than inmates housed in protective custody, did have a right to equal protection. Since they did not allege that they were members of a suspect class their claims were reviewed under a rational basis standard. To prevail in their claims they had to prove "that (1) persons who are similarly situated are treated differently by the government, and (2) [that] the government [has failed] to provide a rational basis for the dissimilar treatment." *Id.* at 304. The court assumed that the plaintiffs had met their burden of proving that they were similarly situated to inmates in protective custody. However it held that the restrictions placed on them—limiting their access to objects which could be used to either create, conceal, or transport weapons or escape devices—were reasonably related to legitimate penological interests. The court stated:

> When creating policies "at an individual prison under the restrictions of a limited budget, prison officials must make hard choices. They must balance many considerations, ranging from the characteristics of the inmates at that prison to the size of the institution" to create an optimal set of privileges and restrictions. Second guessing state prison administrators' decisions inhibits their willingness to experiment and innovate, and is not authorized by the Equal Protection Clause.

*Id.* at 305 (citations omitted). The court found nothing unreasonable nor exaggerated in limiting the type of personal property in administrative segregation cells, because it prevented the creation and transportation of weapons by administrative segregation inmates. Because these limitations were reasonable, the inmates' right to equal protection had not been violated.

The first question is whether Plaintiffs are similarly situated to death row inmates at Graterford. It would appear that they are not. The fact that they are incarcerated in different prisons is the first relevant difference. Another relevant difference is the fact that Greene has the largest population of capital inmates of any Pennsylvania state prison. In *Hosna* the court recognized that the size of the prison and the characteristics of the inmates are relevant considerations. Since Greene has more death row inmates than any other prison in the state, (Defendant Price testified that Greene had at least twice as many death row inmates as any other prison in the state [1]) its security needs are greater. This factor would appear to prevent a finding that Plaintiffs are similarly situated to death row inmates at Graterford and also provide a rational basis for treating the two groups differently.

The parties disagree as to whether the analysis set forth in *Turner* applies to equal protection claims. Plaintiffs claim that it does, Defendants claim that it does not. Defendant argues that the only issues are whether the two groups are similarly situated and, if they are, then whether there is a rational basis for treating them differently. Plaintiffs argue that the court must consider each of the factors identified in *Turner*. First, whether there is a " 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner,* 482 U.S. at 89, 107 S.Ct. 2254. Second, whether there are alternative means of exercising the right that remain open to prison inmates. Third, the court must consider the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally.

1. Price Dep. at 130.

Finally, the court must consider the absence or availability of ready alternatives.

As to the first factor, the government interests put forward to justify the limitation on outdoor recreation are that (1) guards are needed for other programs, such as overseeing the library, conducting searches, and feeding the inmates; (2) there are limits on how many inmates can be exercised at one time; (3) some inmates must exercise alone because they pose threats to other inmates; (4) each time an inmate is taken to exercise, there must be a guard in each individual yard, guards must get the inmate out of his cell, pat search him, cuff him, put him in the exercise unit, and then uncuff him. When he is removed from the yard two officers must go with him.[2]

As to the second factor, there do not appear to be any alternative means for prisoners to exercise the right (obtain two hours of exercise instead of one hour). As to the third factor—the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally—it would appear that to afford Plaintiffs more outdoor exercise time, it would be necessary either to take guards from their other duties or hire additional guards. Plaintiffs propose that the Department of Corrections could allocate additional staffing if needed. While this might be required if the exercise time allotted to Plaintiffs violated the Eighth Amendment or some other constitutional right, it would not appear to be required under an equal protection analysis.

The last factor is the existence or absence of other ready alternatives. Requiring correction officials to hire more guards or transfer guards from other essential duties would not appear to be a ready alternative. In *Turner* the Court stated, "But if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." 482 U.S. at 91, 107 S.Ct. 2254. Plaintiffs have not identified an alternative that would accommodate their interests at *de minimis* cost. Therefore, even considering the *Turner* factors, Plaintiffs have not shown that the limitation of only one hour of outdoor recreation a day is unreasonable.

This is not to make light of Plaintiffs' complaint seeking more outdoor exercise time. It is recognized that Plaintiffs are all sentenced to death; they are confined in a high security unit of a high security prison; they are confined in their cells 23 hours a day; their contacts with others are severely limited. Their outdoor exercise time is one of the few privileges they enjoy. It is understandable that they desire the same opportunity to exercise as is available to inmates at Graterford. However, they have not produced evidence which sufficiently challenges Defendants' evidence of a rational basis for limiting their outdoor exercise time to one hour a day.

It is further noted that if this Court were to find that Plaintiffs are deprived of equal protection in that they are given less time for outdoor exercise than the inmates at Graterford, Defendants could reduce the outdoor exercise time available to death row inmates at Graterford, as they have at Pittsburgh, without violating the Constitution. Therefore as to this claim, Defendants' Motion for Summary Judgment should be granted.

**THE DISPARITY IN RECREATIONAL ITEMS**

█ Plaintiffs complain that they are not permitted to have items during recreational periods which are available to inmates at Graterford, such as board games, religious books or playing cards. Defendants' "Statement of Material Facts Not in Dispute" explains the policy as follows:

28. Superintendent Price decided to limit recreation items available during inmate exercise period [f]or the death row inmates to basketballs and handballs. This policy resulted from the discovery of a cell phone, drugs and a homemade knife on the premises of the G–Unit during the Summer of 1996. This led to the perception of a need to tighten security within the unity [sic],

---

2. Price Dep. at 130–37.

which in turn led to a focus on the exercise yard because, during its ordinary operation, various objects, including board games, religious testaments and playing cards were used by the prisoners. Consequently, the ban reduced this movement and minimized the need for the staff to become involved in checking to make sure that the items that were brought by the inmates, were not used for hiding contraband. Deposition of Price at 99–102. It also increases emphasis on active, aerobic exercise, which is salutary because of the limited time that the inmates have for exercise. *Id.* at 103. Since the escape at SCI–Pittsburgh in January of 1997, death row inmates there have been limited to handballs only. Deposition of Salvay at 35. Death row inmates at SCI–Graterford, however, have access to these sorts of items during recreation. Deposition of Knauer at 65.

(Statement of Material Facts Not In Dispute at 14–15.) During his deposition, Defendant Price testified that until June of 1996 inmates at Greene had been permitted to possess playing cards, chess, checkers, holy books, and cigarettes in the yard. At that time the policy changed because of several incidents. In one incident a death row inmate had a cellular telephone in the CCU. In addition, drugs and a homemade knife were discovered in the unit. Several inmates were involved and they were not sure how many inmates were involved. They still do not know which inmate had the homemade knife. It was determined that the way the exercise yard was operated left the institution open to the movement of items from place to place. They did not know whether the knife got in the unit from the yard or not. In addition to the security concerns, a decision was made that the outdoor recreation should be active recreation, somewhat aerobic and burning up some energy. Passive recreation, such as using cards and checkers and reading the bible could be done inside.[3] Plaintiffs note that since they are essentially confined in their cells twenty-three hours a day, they have no opportunities for direct recreational interaction with fellow prisoners other than the outside yard, and, in some cases, may not be interested in or capable of playing basketball or handball.

This restriction is harder to justify than the limitation to one hour of exercise. If the items were supplied by prison officials and were not permitted to be transported by prisoners it is difficult to see how they would present a security threat. Further, Defendants do not claim that more guards would be needed to supervise inmates who have access to these items. However, it would appear that because two different prisons are involved, the death row inmates in the two prisons are not similarly situated for equal protection purposes. Therefore the Equal Protection Clause would not be available.

It is further noted that if the Court were to find a valid equal protection claim it would appear that Defendants could merely impose the same limitations on the death row prisoners at Graterford as are presently imposed on Plaintiffs and thereby extinguish Plaintiffs' equal protection claim. Therefore it is recommended that as to this claim, Defendants' Motion for Summary Judgment be denied.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrates, the parties are allowed ten (10) days from the date of service to file objections to this report and recommendation. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

Oct. 8, 1997.

---

3. Price Dep. at 97–103.