967 F.2d 73
 Robert H. COVINO, Plaintiff-Appellant,
v.
Joseph PATRISSI, Commissioner of Corrections; Heinz Arenz;
David W. Martinson; Paul Pelletier; David A.
Turner; Thomas Porwitzky; William D.
Finnigan; and K.W. Oddy,
Defendants-Appellees.
 No. 674, Docket 91-2362.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 4, 1991.
Decided June 17, 1992.
 
 John L. Sander, New York City (Michael T. Mervis, Paul, Hastings, Janofsky & Walker, of counsel), for plaintiff-appellant.
 Thomas J. Rushford, Asst. Atty. Gen., Waterbury, Vt. (Jeffrey L. Amestoy, Atty. Gen. State of Vt., Michael McShane, Asst. Atty. Gen., Dept. of Corrections, of counsel), for defendants-appellees.
 Before: CARDAMONE, PIERCE, and MINER, Circuit Judges.
 PIERCE, Circuit Judge:
 
 
 1
 Robert H. Covino appeals from an order of the United States District Court for the District of Vermont, Fred I. Parker, Chief Judge, denying his motion for a preliminary injunction in a suit brought pursuant to 42 U.S.C. § 1983 challenging the visual body-cavity search procedure employed in a Vermont state prison. We affirm the order of the district court.
 
 BACKGROUND
 
 2
 In August 1988, plaintiff-appellant Robert H. Covino, then a pre-trial detainee[1] in the custody of the State of Vermont was transferred to the Northwest State Correctional Facility ("NWSCF"), where he was commingled with sentenced inmates. NWSCF officials rely upon Procedure 300.10 of the Vermont Department of Corrections' Procedural Directives to conduct, inter alia, random visual body-cavity searches of inmates.
 
 
 3
 On August 17, 1990, Covino, proceeding pro se, filed a complaint under 42 U.S.C. § 1983 in the United States District Court for the District of Vermont, naming as defendants Joseph Patrissi, the Commissioner of Corrections, Heinz Arenz, the Superintendent of NWSCF, and other employees at the facility. Covino alleged that on July 13, 1990, he was randomly selected and punished for not consenting to a visual body-cavity search during a random cell search at the institution. He asserted that the search procedure violated his fourth and fourteenth amendment rights as a pre-trial detainee to be free from unreasonable searches. He sought a declaratory judgment and compensatory and punitive damages. He moved also for a temporary restraining order or a preliminary injunction against the defendants' policy of conducting visual body-cavity searches of pre-trial detainees. The matter was referred to a magistrate judge who, on September 21, 1990, conducted a hearing on the motion at which both Covino and Arenz testified.
 
 
 4
 On October 17, 1990, the magistrate judge issued a Report and Recommendation in which he reported the following: Eighty-five percent of the inmates at NWSCF have violence as a feature of their background and eighty percent have drug and/or alcohol abuse backgrounds. Pursuant to Procedure 300.10, random routine "shakedowns" of inmate rooms are conducted at NWSCF.[2] Procedure 300.10 is designed to "effectively control the trafficking of contraband," and, according to the testimony of Arenz, Procedure 300.10 has been successful in achieving that objective.
 
 
 5
 Under Procedure 300.10, the inmates' room numbers are drawn from a container into which all the numbers in the particular unit of NWSCF are placed. The testimony at the hearing did not reflect whether the supervisor who draws the room numbers is able to see the number before it is drawn. Procedure 300.10 provides that one or two inmates' rooms are to be selected at random each night and subjected to a thorough search; also, the inmate-occupants of the rooms are required to undergo a visual body-cavity search. As part of the visual body-cavity search, the inmate is required to remove all his clothing, lift his genitals and spread his buttocks for a visual examination. This examination does not involve any touching of the inmate by NWSCF staff.
 
 
 6
 The magistrate judge also reported that although Covino had been at NWSCF since August 1988, his room number was drawn for the first time randomly in accordance with Procedure 300.10 on July 13, 1990. Covino cooperated with the search of his room; however, with respect to the search of his person, he refused to remove his underwear and to permit a visual body-cavity search. Covino was not forced to undergo the subject search, but he received a disciplinary report and was administratively punished. In his complaint, Covino alleged that he was placed in "lock up" for three days and lost two days of good-time credit.
 
 
 7
 On September 5, 1990, Covino's room number was selected again as part of the nightly shakedown procedure. Covino permitted the search of his room and a visual inspection of his person, but he refused to permit a body-cavity search. As a result, he received administrative sanctions. In an amendment to his complaint, Covino alleged that he was in "lock up" for three days and lost one day of good-time credit for refusing to undergo the subject search. According to supplemental papers submitted after the hearing before the magistrate judge, on October 7, 1990, Covino refused to undergo such a search, which resulted in him receiving a disciplinary report.
 
 
 8
 The magistrate judge identified the issue presented in the case as "whether plaintiff can demonstrate that a policy permitting routine and random [visual body-cavity] searches simply to deter the trafficking in contraband is unconstitutional." He observed that "[i]f the search policy at NWSCF is constitutionally infirm, the nature of the search conducted on plaintiff's person would constitute irreparable harm." Relying upon, inter alia, Washington v. Harper, 494 U.S. 210, 223, 110 S.Ct. 1028, 1037, 108 L.Ed.2d 178 (1990) and Turner v. Safley, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987), for the applicable legal standards, he reported that there was a legitimate connection between Procedure 300.10 and the State of Vermont's interest in deterring trafficking in contraband and in protecting the internal security of NWSCF. He also concluded that the routine visual body-cavity searches conducted pursuant to Procedure 300.10 were neither arbitrary nor irrational and that there was no need for NWSCF to provide inmates with an alternative that would allow NWSCF to achieve its security goals.
 
 
 9
 Based upon a conclusion that Covino had not demonstrated a reasonable likelihood of success on the merits of his claim or that a balance of hardships tipped decidedly in his favor, assuming that there were serious questions going to the merits, the magistrate judge recommended that Covino's request for a preliminary injunction be denied. However, since it was not clear whether the search procedure was being applied in a purely random manner or whether it was conducted to harass, intimidate or punish Covino, he recommended that the complaint not be dismissed.
 
 
 10
 On July 29, 1991, the district judge, in an order, and over Covino's objections, adopted the Report and Recommendation and denied Covino's motion for a temporary restraining order or a preliminary injunction. Covino filed a timely appeal, pursuant to 28 U.S.C. § 1292(a)(1). A panel of this court granted Covino's request for an injunction pending the resolution of his appeal "insofar as the challenged regulation [was] to be applied to [him]."
 
 
 11
 On appeal, Covino argues that the district court erred in denying the motion for a preliminary injunction because the random visual body-cavity searches authorized by Procedure 300.10 are unconstitutional. He asserts that because of the other types of searches permissible at NWSCF the inclusion of the subject search as part of the random room search policy does not add "any meaningful penological value to the other extensive search procedures."[3] In any event, Covino argues that the testimony adduced at the preliminary injunction hearing did not provide sufficient evidence that the challenged search policy is effective or necessary and that the magistrate judge did not correctly apply the standard outlined in Turner. He also contends that, because that policy has not been applied in a random manner as to him, NWSCF should be enjoined from conducting random visual body-cavity searches of him pursuant to Procedure 300.10.
 
 DISCUSSION
 
 12
 The standard for issuing a preliminary injunction is well-settled in this Circuit. The moving party must show (1) irreparable harm and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking the injunctive relief. See, e.g., Resolution Trust Corp. v. Elman, 949 F.2d 624, 626 (2d Cir.1991).
 
 
 13
 We review a district court's grant or refusal to grant a preliminary injunction under the abuse of discretion standard. A district court may abuse its discretion when it relies upon clearly erroneous findings of fact or an error of law in ruling on the preliminary injunction motion. Hanson Trust PLC v. ML SCM Acquisition Inc., 781 F.2d 264, 273 (2d Cir.1986).
 
 A) Irreparable Harm
 
 14
 Subject to our discussion hereinbelow, we agree with the district court--given the fundamental right involved, namely, the right to be free from unreasonable searches--that Covino has sufficiently demonstrated for preliminary injunction purposes that he may suffer irreparable harm arising from a possible deprivation of his constitutional rights. See Mitchell v. Cuomo, 748 F.2d 804, 806 (2d Cir.1984).
 
 
 15
 B) Likelihood of Success on the Merits or Serious Questions Going to the Merits
 
 
 16
 Covino contends that the visual body-cavity searches herein conducted pursuant to Procedure 300.10 violate his fourth and fourteenth amendment rights to be free from unreasonable searches.
 
 
 17
 It is fundamental that persons are protected from unreasonable searches and seizures by the fourth amendment and that this right is enforceable against the states through the fourteenth amendment. See Ker v. California, 374 U.S. 23, 30, 83 S.Ct. 1623, 1628, 10 L.Ed.2d 726 (1963). It has been established that "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." Turner, 482 U.S. at 84, 107 S.Ct. at 2259. Thus, while inmates may lose many of their freedoms at the prison gate, they retain "those rights [that are] not fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration." Hudson v. Palmer, 468 U.S. 517, 523, 104 S.Ct. 3194, 3198, 82 L.Ed.2d 393 (1984).
 
 
 18
 To assess whether Covino's fourth and fourteenth amendment claims presented a likelihood of success on the merits or sufficiently serious questions going to the merits with a balance of hardships tipping decidedly in Covino's favor, it is necessary to determine whether the search in question was reasonable under the fourth amendment. As we stated in Security & Law Enforcement Employees v. Carey, 737 F.2d 187 (2d Cir.1984), when we considered whether warrantless strip and visual body-cavity searches of correction officers were reasonable under the fourth and fourteenth amendments, "[a] court must balance the intrusiveness of the search on the individual's fourth amendment interests against its promotion of legitimate governmental interests." Id. at 201 (citations omitted). The Supreme Court has observed:
 
 
 19
 The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.
 
 
 20
 Bell v. Wolfish, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979).
 
 
 21
 Our method of inquiry is first to determine whether Covino has exhibited a subjective expectation of privacy and whether society is prepared to recognize that expectation of privacy as reasonable. See California v. Ciraolo, 476 U.S. 207, 211, 106 S.Ct. 1809, 1811, 90 L.Ed.2d 210 (1986); Security & Law Enforcement Employees, 737 F.2d at 201-02. If so, we proceed to a second inquiry in which we identify the interests asserted by the state actors for the searches and assess whether, in this particular context, these asserted interests, when balanced against the inmate's privacy expectations, sufficiently promote legitimate governmental interests in the absence of a warrant or some level of individualized suspicion justifying the search. See National Treasury Employees Union v. Von Raab, 489 U.S. 656, 665-66, 109 S.Ct. 1384, 1390-91, 103 L.Ed.2d 685 (1989); Security & Law Enforcement Employees, 737 F.2d at 202-05.
 
 
 22
 In Hudson, the Supreme Court ruled that "shakedown" searches of an inmate's cell did not violate the fourth amendment because prisoners have no fourth amendment privacy rights within the confines of their individual cells. The Supreme Court's decision stemmed from its perception that recognition of such a privacy right was irreconcilable with the concept of incarceration and the needs and objectives of correctional institutions. Hudson, 468 U.S. at 524-26, 104 S.Ct. at 3199-3200. While we acknowledge the clear teaching of the Supreme Court's holding in Hudson with respect to prison spaces, we believe that maintenance of prison security is not burdened unduly by the recognition that inmates do retain a limited right to bodily privacy. Cf. Grummett v. Rushen, 779 F.2d 491, 494-95 (9th Cir.1985) (assuming inmates have fourth and fourteenth amendment privacy right in not being viewed naked by members of opposite sex who are employed as prison guards); Forts v. Ward, 621 F.2d 1210, 1217 (2d Cir.1980) (implying same). The Supreme Court itself has observed that "the Fourth Amendment protects people, not places." Katz v. United States, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967).
 
 
 23
 The record indicates that Covino did exhibit an actual, subjective expectation of bodily privacy and, thus, Covino has demonstrated an interest in retaining this limited right. Further, we have little doubt that society is prepared to recognize as reasonable the retention of a limited right of bodily privacy even in the prison context.[4]
 
 
 24
 Apropos our second inquiry, whether the prison officials had sufficient justification to intrude on Covino's fourth amendment rights, Harper and Turner are instructive. In Harper, the Supreme Court stated that
 
 
 25
 the proper standard for determining the validity of a prison regulation claimed to infringe on an inmate's constitutional rights is to ask whether the regulation is reasonably related to legitimate penological interests. This is true even when the constitutional right claimed to have been infringed is fundamental, and the State under other circumstances would have been required to satisfy a more rigorous standard of review....
 
 
 26
 ... [This standard applies] in all cases in which a prisoner asserts that a prison regulation violates the Constitution.... We made quite clear that the standard of review we adopted in Turner applies to all circumstances in which the needs of prison administration implicate constitutional rights.
 
 
 27
 494 U.S. at 223-24, 110 S.Ct. at 1037-38 (citations and internal quotation marks omitted).
 
 
 28
 In Turner, the Court listed four factors governing the review of prison regulations: (i) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (ii) whether there are alternative means of exercising the right in question that remain open to prison inmates; (iii) whether accommodation of the asserted constitutional right will have an unreasonable impact upon guards and other inmates, and upon the allocation of prison resources generally; and (iv) whether there are reasonable alternatives available to the prison authorities. Turner, 482 U.S. at 89-90, 107 S.Ct. at 2261-62. The burden is upon the prisoner to show that a challenged prison regulation is unreasonable. See Fromer v. Scully, 874 F.2d 69, 74 (2d Cir.1989).
 
 
 29
 With respect to the first Turner factor, in our view, on this record, NWSCF has demonstrated that the random visual body-cavity searches authorized by Procedure 300.10 are reasonably related to its legitimate penological interests.[5] Arenz testified at the preliminary injunction hearing that the subject searches at NWSCF assist the institution in preserving internal order and discipline and that maintaining institutional security would be adversely affected by the likely introduction of drugs into the inmate population. He testified that on occasion the searches conducted at NWSCF had uncovered drugs and that occasionally contraband and drugs were found secreted in an inmate's rectum. In light of the nature of NWSCF's inmate population--which includes a substantial number of inmates who have violence as a feature of their background and have drug and/or alcohol abuse backgrounds--the magistrate judge did not err in reporting that there was a legitimate and rational connection between the challenged searches conducted pursuant to Procedure 300.10 and NWSCF's security interests. See Michenfelder v. Sumner, 860 F.2d 328, 332-33 (9th Cir.1988) (upholding visual body-cavity searches of maximum security inmates each time inmate leaves, returns, or is escorted within maximum security unit) (citing cases).
 
 
 30
 As to the second and third Turner factors, although inmates do possess a limited right to bodily privacy, some aspects of that right must yield to searches for contraband, even random visual body-cavity searches, so that prison administrators may maintain security and discipline in their institutions. See Cumbey v. Meachum, 684 F.2d 712, 714 (10th Cir.1982) (per curiam). There do not appear to be any alternative means that would allow Covino to exercise his limited bodily privacy rights and at the same time allow NWSCF to achieve fully the effectiveness of the challenged searches. We note that Arenz testified at the preliminary injunction hearing that under NWSCF procedures, such searches are conducted in the inmate's room with the door closed and that the only persons present are two prison officers and the inmate being searched. This appears to us to be a reasonable accommodation that is sufficient to respect Covino's limited bodily privacy rights under the circumstances presented herein. See Bonitz v. Fair, 804 F.2d 164, 173 (1st Cir.1986) (body-cavity search of female inmates conducted by police officers, involving touching, conducted in non-hygienic manner and in presence of male officers, violated inmates' fourth amendment rights), overruled on other grounds by Unwin v. Campbell, 863 F.2d 124, 132 (1st Cir.1988). Based upon Arenz's testimony, the magistrate judge reported that the subject searches conducted pursuant to Procedure 300.10 addressed the State's legitimate governmental interest in prison security and that prohibiting such searches would have an adverse impact upon guards, other inmates and the allocation of prison resources.
 
 
 31
 As for the fourth Turner factor, Covino argues that the federal regulations,[6] which authorize visual searches based upon a "reasonable belief" standard, provide "an equally easy and obvious alternative" to the challenged searches conducted at NWSCF. The fourth Turner factor is not a "least restrictive alternative" test, rather it requires the inmate to "point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests." Turner, 482 U.S. at 90-91, 107 S.Ct. at 2262. In light of Arenz's testimony at the preliminary injunction hearing concerning the characteristics of NWSCF's inmate population, we do not believe that the federal regulation presents an alternative method that would impose only a de minimis burden on NWSCF's interests. The prison administrators have sought to balance the competing concerns of inmates with the need to maintain internal security and discipline at NWSCF, and, in our view, the random visual body-cavity search policy adopted pursuant to Procedure 300.10 is not an unreasonable regulation. As Turner requires, we defer to the expertise of the state prison officials, who may anticipate security problems and adopt appropriate solutions for the many problems associated with prison administration. Id. at 89, 107 S.Ct. at 2261.
 
 
 32
 Hurley v. Ward, 584 F.2d 609 (2d Cir.1978) is not to the contrary. In Hurley, this court affirmed the issuance of a preliminary injunction that prohibited visual anal and genital searches of Michael X. Hurley, without probable cause. Our holding was based upon a record that contained evidence that Hurley had been subjected to physical and verbal abuse during the searches. Id. at 611. Hurley does not forbid the use of the challenged searches herein. Indeed, because there was a lack of evidence that the visual anal and genital searches conducted on other inmates in New York State's prison population involved similar mistreatment of the inmate being searched, we reversed that portion of the injunction prohibiting such searches, without probable cause, of all inmates in the New York State correctional system. Id. at 612.
 
 
 33
 Covino has not demonstrated a likelihood of success on the merits of his claims or sufficiently serious questions going to the merits with a balance of hardships tipping decidedly in his favor, therefore, we affirm the district court's order denying his motion for a temporary restraining order or a preliminary injunction.
 
 
 34
 We disagree with the contention Covino made at oral argument, namely, that the district court effectively ruled on whether NWSCF officials have applied Procedure 300.10 in a non-random manner as to him. In the Report and Recommendation, the magistrate judge explicitly noted that since it was not clear from the testimony at the preliminary injunction hearing whether the search procedure was being applied in a purely random manner or if the searches were intended to harass, intimidate or punish Covino, the complaint not be dismissed. The district court adopted the Report and Recommendation in its entirety, thus, this issue has not yet been determined.
 
 CONCLUSION
 
 35
 Based upon the foregoing, the order of the district court denying a preliminary injunction is affirmed. This court's stay with respect to the application of the search procedure as applied to Covino is continued pending final determination of this issue by the district court.
 
 
 
 [1]
 According to the State of Vermont, in May 1991, following his conviction for kidnapping a child under the age of sixteen, Covino was sentenced to imprisonment for 20-35 years
 
 
 [2]
 Procedure 300.10 provides, in pertinent part:
 
 
 [1]
 At the Shift Supervisor or Security & Operations Supervisor's discretion, but at least once a month, all inmates' rooms will be thoroughly searched
 
 
 [2]
 The Shift Supervisor will have one or two rooms shaken down nightly. This will be done by drawing name or room numbers and recorded in a log
 3a. The Shift Supervisor or the Security & Operations Supervisor will pick the room to be searched.
 3b. Designates two (2) officers to conduct the search.
 3c. Clears the wing of all inmates or locks them in their own room.
 3d. Informs the inmate of the search.
 3e. Strip searches the inmate in their [sic] room....
 
 
 [3]
 In addition to the random room search policy, under Procedure 300.10, inmate rooms are inspected daily and thoroughly searched at least once a month. Procedure 300.10 provides for "strip searches" of visitors when there is reasonable suspicion that the visitor is carrying contraband. Inmates may be "strip searched" whenever an employee feels that the inmate may be in possession of contraband, when the inmate leaves designated work areas or before the inmate enters his unit. Procedure 300.10 does not indicate whether these "strip searches" include visual body-cavity searches
 
 
 [4]
 We need not consider whether Covino's status as a pre-trial detainee entitled him to more extensive fourth amendment protection with respect to visual body-cavity searches than a convicted, incarcerated inmate because the constitutionality of Procedure 300.10, as a "prison regulation," is assessed by asking whether it is reasonably related to legitimate penological interests. E.g., Harper, 494 U.S. at 223, 110 S.Ct. at 1037. Although this inquiry is necessitated by finding a reasonable, subjective expectation of privacy, its resolution is not, at least in this case, affected by the privacy interest implicated because the "legitimate penological interests" asserted apply equally to pre-trial detainees and convicted inmates. Cf. Bell, 441 U.S. at 558, 99 S.Ct. at 1884 (as to both pre-trial detainees and convicted inmates, inquiry is whether searches are unreasonable)
 
 
 [5]
 To the extent that Hurley v. Ward, 549 F.Supp. 174, 186 (S.D.N.Y.1982), holds that routine strip searches of inmates other than after contact visits are "unreasonable and unjustified," we reject that view in this case
 
 
 [6]
 The cited federal regulation provides:
 Body searches of inmates
 ....
 (b) Visual search--a visual inspection of all body surfaces and body cavities.
 (1) Staff may conduct a visual search where there is reasonable belief that contraband may be concealed on the person, or a good opportunity for concealment has occurred. For example, placement in a special housing unit (see 28 CFR part 541, subpart B), leaving the institution, or re-entry into an institution after contact with the public (after a community trip, court transfer, or after a "contact" visit in a visiting room) is sufficient to justify a visual search. The visual search shall be made in a manner designed to assure as much privacy to the inmate as practicable.
 * * *
 
 
 [28]
 C.F.R. § 552.11 (1991) (emphasis added)