Tanya L. MARCHWINSKI, Terri J. Konieczny, and Westside Mothers, on behalf of all similarly situated persons, Plaintiffs,

v.

Douglas E. HOWARD, in his official capacity as Director of The Family Independence Agency of Michigan, a Governmental Department of the State of Michigan, Defendant.

No. 99–10393.

United States District Court,
E.D. Michigan,
Northern Division.

Sept. 1, 2000.

Robert A. Sedler, Wayne State University, Law School, Detroit, MI, David R. Getto, Cameron R. Getto, Sommers,

Schwartz, Southfield, MI, Kary L. Moss, ACLU, Detroit, MI, for plaintiffs.

Morris J. Klau, Michigan Department of the Attorney General, Detroit, MI, for defendant.

Susan K. McParland–Nash, Detroit, MI, for Michigan Legal Services, amicus curiae.

## OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

ROBERTS, District Judge.

### I. *Introduction*

This case concerns the constitutionality of M.C.L § 400.57 (the "Act"), a Michigan law which authorizes suspicionless drug testing of welfare recipients.

Plaintiffs Tanya Marchwinski, Terry Konieczny and Westside Mothers filed their Complaint on September 30, 1999, alleging that the Family Independence Program ("FIP") drug testing requirement violates the Fourth Amendment of the United States Constitution. Plaintiffs bring this action on their own behalf and on behalf of a class of all adult residents of Michigan whose ability to receive FIP benefits is or will be conditioned on their willingness to submit to drug testing.[1]

This Court entered a Temporary Restraining Order on November 10, 1999, and, since then, the parties have engaged in discovery and have filed additional papers and pleadings for this Court's consideration. After a review of the additional filings, the Court will now enter a Preliminary Injunction. The Court finds that Plaintiffs are likely to succeed on the merits of their claim, inasmuch as Michigan's requirement that welfare recipients be drug tested does not fit within the closely guarded category of constitutionally permissible suspicionless testing. Drug testing under these circumstances must satisfy a special need, and that need must concern public safety. In this instance, there is no indication of a concrete danger to public safety which demands departure from the Fourth Amendment's main rule and normal requirement of individualized suspicion.

### II. *Background*

On August 22, 1996, the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA") was signed into law. Replacing Aid to Families with Dependent Children, ("AFDC"), the PRWORA created a program called Temporary Assistance for Needy Families ("TANF"). Whereas AFDC was an entitlement program that provided cash assistance, TANF's emphasis is on moving recipients into work. Of critical importance is that no "public safety" issues are implicated in the stated goals and principles of TANF.[2]

Towards its stated goal of moving welfare recipients to work, PRWORA re-

---

1. Plaintiffs' Motion for Class Certification was granted on April 14, 2000.

2. As explained by the Department of Health and Human Services, Administration for Children and Families ("ACF"),

    The new law reflects widespread, bipartisan agreement on a number of key principles:
    —Welfare reform should help move people from welfare to work.
    —Welfare should be a short-term, transitional experience, not a way of life.
    —Parents should receive the child care and the health care they need to protect their children as they move from welfare to work.

    —Child support programs should become tougher and more effective in securing support from absent parents.
    —Because many factors contribute to poverty and dependency, solutions to these problems should not be 'one size fits all.' The system should allow States, Indian tribes, and localities to develop diverse and creative responses to their own problems.
    —The Federal government should focus less attention on eligibility determinations and place more emphasis on program results.
    —States should continue to make substantial investments of State funds in addressing the needs of low-income families.
    64   Fed.Reg. 17720, 17721–17722 (1999).

quires TANF recipients to return to work either when deemed ready to do so by their State or within twenty-four months after receiving benefits, whichever comes earlier. 42 U.S.C. § 602(a)(1)(A). Additionally, each TANF family has a sixty month lifetime limit for receiving benefits under the program. 42 U.S.C. § 608(a)(7). PRWORA furthermore gives the States both the flexibility and the duty to design programs and services to move families from welfare to work. ACF, *Summary of Final Rule, Temporary Assistance for Needy Families (TANF) Program* at 3.[3]

Of particular relevance to this case, PRWORA authorizes but does not mandate States to test TANF recipients for use of controlled substances and to sanction those recipients who test positive. 21 U.S.C. § 862b. Thus far, Michigan is the only State to implement such testing.[4]

Michigan's Family Independence Agency ("FIA") provides TANF assistance through the FIP. Beginning October 1, 1999, until enjoined by this Court in November last year, the FIA operated a pilot program which required drug-testing and treatment for FIP applicants in certain regions of the State.[5] The program is mandated by M.C.L. § 400.57*l*, which provides, in relevant part, as follows:

(2) The family independence agency shall implement a pilot program of substance abuse testing as a condition for family independence assistance eligibility in at least 3 counties, including ran-

dom substance abuse testing. It is the intent of the legislature that a statewide program of substance abuse testing of family independence assistance recipients, including random substance abuse testing, be implemented before April 1, 2003.

Section 57*l* (2).

The statute further provides that individuals who test positive for substance abuse "shall agree to and participate in substance abuse assessment and comply with a required substance abuse treatment plan." Section 57*l* (3).

The specific provisions of the FIA pilot program are detailed in the Program Eligibility Manual[6] ("PEM"). The PEM describes the FIA's goal of helping families to become self-sufficient and states: "Because having strong family relationships may be more difficult if there are substance abuse issues in the home, and because substance abuse is a barrier to employment, drug testing is being piloted in Michigan." PEM at 1. According to the PEM, all new FIP applicants must be tested prior to a case opening. Additionally, after six months, twenty percent of adults and minor parent grantees with active cases up for redetermination will be randomly selected to be tested.[7]

For those who test positive, cooperation in a substance abuse assessment, including an interview with a treatment agency, is mandatory. If the assessment results in a referral for treatment, the client must also comply with the treatment plan.[8] If a

---

**3.** This document is found at Defendant's Exhibit 1 and at *www.acf.dhhs.gov/programs/ofa/exsumcl.htm.* The final rules described in this document are found at 45 C.F.R. Parts 260 through 265.

**4.** The Lindesmith Center, *Drug Testing Welfare Applicants: A Nationwide Survey of Policies, Practices and Rationales,* Interim Report, 2 (1999) (Plt's Exh. X). The majority of States responding to the survey "expressed the opinion that drug testing of TANF applicants may be unlawful and cited legal obstacles as a reason why they did not engage in suspicionless testing." *Id.*

**5.** The FIA pilot program was implemented in Alpena and Presque Isle Counties, Berrien County, and the Joy/Greenfield district of Wayne County.

**6.** See Plaintiffs' Exhibit U.

**7.** The only exemptions include applicants who are participating in a court ordered substance abuse treatment program, eighteen/nineteen year-olds who are treated as children due to school attendance requirements, and applicants who are at least sixty-five years old.

**8.** Although the client must comply with treatment, "relapse does not constitute noncompli-

client does not comply with the testing/treatment requirements, s/he is given the opportunity to show good cause, which includes demonstrating that s/he: (1) has become exempt; (2) has a debilitating illness or injury; and/or (3) gives credible information that an unplanned event or factor interfered with compliance.

The PEM details different penalties for non-compliance. Where an applicant "fails or refuses, without good cause, to submit a specimen for testing by the end of the first business day following the application interview," the FIP application will be denied. *Id.* at 6. Similarly, where an applicant fails to complete the assessment process and/or fails to comply with a treatment plan within the first two months without good cause, his/her case will be closed. Where an active FIP client chosen randomly fails to complete a drug test without good cause, his/her FIP benefit amount will be reduced twenty-five percent for the first month of non-compliance, and twenty-five percent for each subsequent month of non-compliance. If the client remains non-compliant at the end of the fourth month, his/her case will be closed.

The instant question before the Court is whether it should continue to enjoin the State from conducting such suspicionless testing of FIP applicants and recipients. The Court concludes that it should.

## III. *Analysis*

### A.

■ In the Sixth Circuit, when determining whether to issue a preliminary injunction, the court must consider four factors:

(1) the likelihood that the party seeking the preliminary injunction will succeed on the merits of the claim; (2) whether the party seeking the injunction will suffer irreparable harm without the grant of the extraordinary relief; (3) the prob-

ability that granting the injunction will cause substantial harm to others; and (4) whether the public interest is advanced by the issuance of the injunction.

*Washington v. Reno,* 35 F.3d 1093, 1099 (6th Cir.1994).

With respect to the first factor, some opinions have expressed a need for the court to find a "strong" likelihood of success on the merits. *See United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Regional Transit Authority,* 163 F.3d 341, 347 (6th Cir.1998). Other opinions have stated that it is enough for the movant to show "serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if an injunction is issued." *See Friendship Materials, Inc. v. Michigan Brick, Inc.,* 679 F.2d 100, 105 (6th Cir.1982). Still others emphasize that the four considerations are factors to be balanced rather than prerequisites that must be met. *See Mascio v. Public Employees Retirement System of Ohio,* 160 F.3d 310, 313 (6th Cir.1998). "A district court is required to make specific findings concerning each of the four factors, unless fewer factors are dispositive of the issue." *Six Clinics Holding Corp., II v. Cafcomp Systems, Inc.,* 119 F.3d 393, 399 (6th Cir. 1997).

In this case, the Court finds that Plaintiffs will likely succeed on the merits of their claim that the FIP suspicionless drug testing violates the Fourth Amendment. Further, the other factors also weigh in Plaintiffs' favor.

### B.

The Fourth Amendment of the United States Constitution reads:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and

ance." Deposition of Ann Marie Sims, Plaintiffs' Exhibit Y at 84. "In other words, the existence of a subsequent dirty urine would

not mean sanction, denial, closure in and of itself." *Id.*

seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

■ Historically, the Supreme Court has generally viewed the Fourth Amendment as requiring "some quantum of individualized suspicion" for a search or seizure to be constitutional. *U.S. v. Martinez–Fuerte,* 428 U.S. 543, 560, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976). Furthermore, it is universally agreed that the collection and testing of urine is a search within the meaning of the Fourth Amendment. *See, e.g., Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 617, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989).

Nevertheless, in *Skinner,* an opinion described by a dissenter as "unprincipled and dangerous," *Id.* at 641, 109 S.Ct. 1402 (Marshall, J. dissenting), the Supreme Court upheld suspicionless drug testing of railroad employees involved in train accidents. The Court reasoned:

[T]he permissibility of a particular practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.

In most criminal cases, we strike this balance in favor of the procedures described by the Warrant Clause of the Fourth Amendment. Except in certain well-defined circumstances, a search or seizure in such a case is not reasonable unless it is accomplished pursuant to a judicial warrant issued upon probable cause. **We have recognized exceptions to this rule, however, when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.** When faced with such special needs, we have not hesitated to balance the governmental and privacy interests to assess the practicality of the warrant

and probable-cause requirements in the particular context.

*Skinner* at 619, 109 S.Ct. 1402 (citations and quotation marks omitted; emphasis added).

The Court thus ruled:

In limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion.

*Id.* at 624, 109 S.Ct. 1402.

Since *Skinner,* the Supreme Court has sanctioned suspicionless drug testing of United States Customs agents whose positions caused them to be directly involved with drug interdiction. *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). It further upheld random, suspicionless testing of high school athletes. *Vernonia School Dist. 47J v. Acton,* 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995). But, in *Chandler v. Miller,* 520 U.S. 305, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997), the Supreme Court's most recent pronouncement on suspicionless drug testing, the Court found that the State of Georgia had gone too far in requiring that all candidates for State office pass a drug test.

**C.**

The *Chandler* Court reiterated that suspicionless searches are allowed only under " 'certain limited circumstances.' " *Id.* at 308, 117 S.Ct. 1295 *citing Von Raab* at 668, 109 S.Ct. 1384. The Court further emphasized that the "core issue" it needed to address was whether the drug testing was warranted by a special need. It stated that not only must there be a special need, but if there is one, "it must be substantial—important enough to override the individual's acknowledged privacy interest [and] sufficiently vital to suppress the

Fourth Amendment's normal requirement of individualized suspicion." *Id.* at 318, 117 S.Ct. 1295.

After reviewing the "special needs" that had justified departure from the usual requirement of individualized suspicion in its preceding cases, the *Chandler* Court held that the Georgia requirement did "not fit within the closely guarded category of constitutionally permissible suspicionless searches." *Id.* at 309, 117 S.Ct. 1295. "Georgia has failed to show, in justification of the [drug testing statute], a special need of that kind." *Id.* at 318, 117 S.Ct. 1295.

As described by the *Chandler* Court, the special need articulated in *Skinner* was that of ensuring safety; railroad employees are in a position to " 'cause great human loss before any signs of impairment become noticeable to supervisors.' " *Id.* at 315, 117 S.Ct. 1295 *quoting Skinner* at 634, 109 S.Ct. 1402. And, the government had shown a special need in *Von Raab* because the customs agents were the first line of defense against drug smuggling.

> Work directly involving drug interdiction and posts that require the employee to carry a firearm pose grave safety threats to employees who hold those positions, and also expose them to large amounts of illegal narcotics and to persons engaged in crime; illicit drug users in such high-risk positions might be unsympathetic to the Service's mission, tempted by bribes, or even threatened with blackmail.

*Id.* at 316, 117 S.Ct. 1295.

Finally, the *Chandler* Court described the special need in *Vernonia* as deriving from the fact that there was an "immediate crisis" and that student athletes were " 'leaders of the drug culture.' " *Id.* at 316, 117 S.Ct. 1295. The drug testing served the purpose of "deterring drug use by schoolchildren" and addressed "the risk of injury a drug-using student athlete cast on himself and those engaged with him on the playing field." *Id.* at 317, 117 S.Ct. 1295.

In finding the statute at issue to be unconstitutional, the *Chandler* Court found that Georgia had not shown a special need. "Notably lacking in respondents' presentation is any indication of a concrete danger demanding departure from the Fourth Amendment's main rule." *Id.* at 318–319, 117 S.Ct. 1295. Thus, in light of *Chandler,* when suspicionless drug testing is being challenged, the initial inquiry must be whether a special need has been shown.

> Prior to conducting the balancing, in surveying the public interests at issue, the Court said that we must specifically inquire into whether the drug-testing program at issue is warranted by a 'special need.' *See Chandler,* 520 U.S. at 318, 117 S.Ct. at 1303. Only if we can say that the government has made that special need showing do we then inquire into the relative strengths of the competing private and public interests to settle whether the testing requirement is reasonable under the Fourth Amendment. If the government has not made its special need showing, then the inquiry is complete, and the testing program must be struck down as unconstitutional.

*19 Solid Waste Dept. Mechanics v. City of Albuquerque,* 156 F.3d 1068, 1072 (10th Cir.1998).

And, the State's alleged special need must concern public safety.

> We reiterate, too, that where the risk to public safety is substantial and real, blanket suspicionless searches calibrated to the risk may rank as 'reasonable'—for example, searches now routine at airports and at entrances to courts and other official buildings. *See Von Raab,* 489 U.S., at 674–676, and n. 3, 109 S.Ct., at 1395–1396, and n. 3. But where, as in this case, public safety is not genuinely in jeopardy, the Fourth Amendment precludes the suspicionless search, no matter how conveniently arranged.

Chandler at 323.

### D.

■ As in *Chandler,* the State in this case has not demonstrated a special need

that justifies departure from the ordinary Fourth Amendment requirement of individualized suspicion. The State has not shown that public safety is genuinely placed in jeopardy in the absence of drug testing of all FIP applicants and of random, suspicionless testing of FIP recipients.

The primary justification advanced by the State for instituting mandatory drug testing is to move more families from welfare to work. In House Legislative Analyses of House Bill 4090, the "Apparent Problem" was described as follows:

Michigan reformed its welfare system in 1995.... While the new program has been largely successful, none of the reforms have been able to overcome one persistent problem: for some people, the major barrier to employment is rooted in substance abuse.

(Plt's Exhs. E at 1, F at 1 & G at 1).

The State's desire to address substance abuse as a barrier to employment is laudable and understandable in view of the Federal mandate to move welfare recipients to work. Yet, it does not constitute a special need sufficient to warrant a departure from the Fourth Amendment's main rule. "[W]here, as in this case, public safety is not genuinely in jeopardy, the Fourth Amendment precludes the suspicionless search, no matter how conveniently arranged." *Id.* at 323, 117 S.Ct. 1295. The State does not even attempt to argue that its goal of moving welfare recipients to work is a public safety issue, nor could it. Consequently, the State's FIP drug testing does "not fit within the closely guarded category of constitutionally permissible suspicionless searches." *Chandler* at 309, 117 S.Ct. 1295.

Despite *Chandler's* clear language to the contrary, the State argues that it does not have to show that its special need involves public safety in order to justify blanket drug testing. The State claims that that language in the *Chandler* opinion was simply a response to Georgia's argument that public safety justified its requirement of mandatory drug testing of candidates for State office. To the contrary, Georgia did not cite public safety as justifying its drug testing requirement.

[Georgia's] defense of the statute rests primarily on the incompatibility of unlawful drug use with holding high state office. The statute is justified, respondents contend, because the use of illegal drugs draws into question an official's judgment and integrity; jeopardizes the discharge of public functions, including antidrug law enforcement efforts; and undermines public confidence and trust in elected officials. Brief for Respondents 11–18. The statute, according to [Georgia], serves to deter unlawful drug users from becoming candidates and thus stops them from attaining high state office.

*Chandler* at 318, 117 S.Ct. 1295. Since the *Chandler* Court's ruling that public safety must be in jeopardy was not in response to Georgia's defense, there is no genuine question that the *Chandler* Court meant what it said.

Public safety has been the primary justification for each case in which suspicionless drug testing has been upheld. In *Skinner*, the Court held that the Government's interest in such testing was compelling because "[e]mployees subject to the tests discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences." *Skinner* at 628, 109 S.Ct. 1402. In *Von Raab*, the Court emphasized "the extraordinary safety and national security hazards that would attend the promotion of drug users to positions that require the carrying of firearms or the interdiction of controlled substances...." *Von Raab* at 674, 109 S.Ct. 1384. Likewise, in *Knox County Educ. Ass'n v. Knox County Bd. of Educ.*, 158 F.3d 361, 374–378 (6th Cir.1998), the court upheld drug testing of individuals applying for teaching and other positions only after

it found that those positions were "safety sensitive."

Asserting that public safety need not be in jeopardy, the State cites a portion of *Vernonia* in which the Court indicated that deterring drug use by schoolchildren is an important governmental concern. *Vernonia* at 661, 115 S.Ct. 2386. However, despite the fact that deterring drug use by schoolchildren in general was cited as important, it was the more narrowly tailored drug testing of student athletes that was sanctioned by the Court:

> [I]t must not be lost sight of that this program is directed more narrowly to drug use by school athletes, where the risk of immediate physical harm to the drug user or those with whom he is playing his sport is particularly high. Apart from psychological effects, which include impairment of judgment, slow reaction time, and a lessening of the perception of pain, the particular drugs screened by the District's Policy have been demonstrated to pose substantial physical risks to athletes.

*Id.* at 662, 115 S.Ct. 2386. Public safety was, thus, an important component of both the school's drug testing program and its approval by the Supreme Court.

### E.

■ The State argues that it has shown a special need even if jeopardy to public safety is required. It states that there is overwhelming evidence that substance abuse and child neglect are highly correlated and that the children are the primary beneficiaries of FIP benefits. "Given the State's *parens patriae* interest in minor FIP recipients, the State has a strong interest in identifying substance abusers not only for the negative impact such behavior may have on fulfilling employment goals but also because of the potential danger posed to the children of abusers,

whose interests are paramount." (Dft's Br. at 27–28).

The State's argument in this regard is misplaced. While the State has asserted that the drug testing program is designed in part to encourage "strong family relationships," PEM at 1, TANF is not aimed at addressing child abuse or neglect. Rather, the TANF program was designed to:

> (1) provide assistance to needy families so that children may be cared for in their own homes or in the homes of relatives;
>
> (2) end the dependence of needy parents on government benefits by promoting job preparation, work, and marriage;
>
> (3) prevent and reduce the incidence of out-of-wedlock pregnancies and establish annual numerical goals for preventing and reducing the incidence of these pregnancies; and
>
> (4) encourage the formation and maintenance of two-parent families.

42 U.S.C. § 601.

Additionally, in Michigan, the FIP is not designed to address child abuse or neglect. Instead, the FIP was created to:

> (a) Provide financial support to eligible families while they pursue self-improvement activities and engage in efforts to become financially independent.
>
> (b) Ensure that recipients who are minor parents live in adult-supervised households in order to reduce long-term dependency on financial assistance.
>
> (c) Assist families in determining and overcoming the barriers preventing them from achieving financial independence.
>
> (d) Ensure that families pursue other sources of support available to them.

M.C.L. § 400.57a(2).[9]

Since TANF generally, and Michigan's FIP specifically, are not designed to ame-

---

**9.** The FIA's Children's Protective Services is the entity charged with addressing child abuse and neglect. "Children's Protective

Services (CPS) has responsibility to investigate allegations that a child under the age of 18 is suspected of being abused or neglected

liorate child abuse or neglect, the State cannot legitimately advance such abuse or neglect as supporting a special need sufficient to single out FIP recipients for suspicionless drug testing. In other words, the State's financial assistance to parents for the care of their minor children through the FIP cannot be used to regulate the parents in a manner that erodes their privacy rights in order to further goals that are unrelated to the FIP.[10]

If the State is allowed to drug test FIP recipients in order to ameliorate child abuse and neglect by virtue of its financial assistance on behalf of minor children, that excuse could be used for testing the parents of all children who receive Medicaid, State Emergency Relief, educational grants or loans, public education or any other benefit from the State. In all cases in which the State offers a benefit on behalf of minor children, the State could claim that it has a broad interest in the care of those children which overcomes the privacy rights of the parents. Indeed, the query posed by Justice Marshall in his dissent in *Wyman v. James*, 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971), is a pertinent inquiry to make here:

> Would the majority sanction, in the absence of probable cause, compulsory visits to all American homes for the purpose of discovering child abuse? Or is this court prepared to hold as a matter of constitutional law that a mother, merely because she is poor, is substantially more likely to injure or exploit her children? Such a categorical approach to an entire class of citizens would be

dangerously at odds with the tenets of our democracy.

*Id.* at 342, 91 S.Ct. 381.

Upholding this FIP suspicionless drug testing would set a dangerous precedent.

### F.

The lack of connection between the FIP program and Michigan's efforts toward reducing child abuse or neglect contrasts this case with *Wyman.* The State cites *Wyman* as supporting its claim that it has *parens patriae* interest in minor FIP recipients. In *Wyman*, the Court held that home visits by case workers did not constitute a search within the meaning of the Fourth Amendment. *Id.* at 317–318, 91 S.Ct. 381. It further stated that, even if the visit was a search, it would not be proscribed by the Fourth Amendment. The Court described home visits as "the heart of welfare administration" and noted that "[t]he home visit is an established routine in States besides New York." *Id.* at 320, 91 S.Ct. 381. In contrast, child abuse and neglect are not within the FIP's mandate. Moreover, drug testing of welfare recipients as a means of preventing such abuse and neglect is not practiced anywhere else in the country. Blanket drug testing of welfare recipients has, in fact, been rejected by most States primarily because it is viewed as unconstitutional.[11]

While *Wyman* did hold that home visits, which were found to not even constitute searches, did not offend the Fourth Amendment, it would be quite a stretch for this Court to hold that *Wyman* supports drug testing which (1) clearly constitutes a search within the meaning of the Fourth

---

by a parent, legal guardian or adult who lives in the same home as the child." FIA's Client Services & Programs website, *www.mfia.state.mi.us/CFSAdmin/cps/cps.html.*

**10.** It should be noted that the State does not claim to have *in loco parentis* authority over the minor children of FIP recipients. This case, therefore, contrasts with *Vernonia,* where the Supreme Court upheld the drug testing of high school athletes over whom the school was found to stand *in loco parentis,*

"permitting a degree of supervision and control that could not be exercised over free adults." *Vernonia* at 655, 115 S.Ct. 2386. This case is further distinguishable from *Knox County,* where the drug testing of school personnel in safety sensitive positions was justified in part by the "*in loco parentis* obligations imposed upon them." *Knox County* at 375.

**11.** *See* note 4, *supra.*

Amendment and (2) is not justified by an interest that is germane to the FIP. Even if *Wyman* did support such a holding, it would not be sustainable in light of the more recent *Chandler*.

**G.**

*Chandler* undermines the State's reliance on *Wyman* in two respects. First, the State cites *Wyman* as stressing that the voluntary nature of applying for welfare benefits diminishes the applicants expectation of privacy. The *Wyman* Court stated, "So here Mrs. James has the 'right' to refuse the home visit, but a consequence in the form of cessation of aid.... The choice is entirely hers, and nothing of constitutional magnitude is involved." *Wyman* at 324, 91 S.Ct. 381.

Yet, in *Chandler,* the drug testing involved an even more voluntary activity. No one is compelled to run for public office, and the applicants for public office are not in the desperate straits that the State concedes FIP applicants are in when they apply for assistance (Dft's Br. at 26). Notwithstanding the voluntary nature of applying for public office, the *Chandler* Court held that mandatory, suspicionless drug testing of candidates violated the Fourth Amendment.

In addition, the *Chandler* Court made clear that suspicionless drug testing is unconstitutional if there is no showing of a special need, and that the special need must be grounded in public safety. *Chandler* at 318, 323, 117 S.Ct. 1295; *19 Solid Waste Dept. Mechanics* at 1072. To the extent that *Wyman* could be construed as allowing otherwise, its holding is no longer viable.

Since the State has failed to show, in justification of the Act, a special need grounded in public safety which would warrant the suspicionless drug testing of FIP recipients, this Court's Fourth Amendment inquiry is complete, and it need not inquire into the relative strengths of the competing private and public interests to settle whether the testing require-

ments is reasonable under the Fourth Amendment. *19 Solid Waste Dept. Mechanics* at 1072. "[T]he testing program must be struck down as unconstitutional." *Id.* Thus, the Court finds that Plaintiffs have established a strong likelihood of succeeding on the merits of their Fourth Amendment claim.

**H.**

The questions now before the Court are whether the Plaintiffs would suffer irreparable harm if their request for an injunction is denied, whether an injunction would harm others, and whether the public interest is advanced by the issuance of the injunction. These factors unquestionably weigh in Plaintiffs' favor.

**1.** *Irreparable harm to Plaintiffs*

■ Violations of the Fourth Amendment constitute the type of irreparable injury for which injunctive relief is appropriate. *See Easyriders Freedom F.I.G.H.T. v. Hannigan,* 92 F.3d 1486, 1500–1501 (9th Cir.1996). The right to be free from unreasonable searches is a fundamental right, and, accordingly, the possible violation of that right is alone sufficient to demonstrate irreparable harm. *Covino v. Patrissi,* 967 F.2d 73, 76 (2nd Cir.1992).

**2.** *Harm to Others*

The State "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Zepeda v. U.S. I.N.S.,* 753 F.2d 719, 727 (9th Cir.1983). It should further be noted that an injunction will not preclude the State from taking other measures to address substance abuse as a barrier to employment. The State may screen its applicants and recipients for substance abuse and drug test those that it reasonably suspects are using illegal substances.

The State points out that some mechanisms for screening welfare applicants for substance abuse have proven to be ineffec-

tive, such as Maryland's and New York's methods of asking applicants a set of questions.[12] However, the Substance Abuse Subtle Screening Inventory ("SASSI") has received positive reviews. Oregon's use of the SASSI, administered by trained substance abuse counselors, "has been shown to identify a substantial fraction of recipients who are in need of substance abuse treatment...."[13] In a Report of the Virginia Department of Social Services to the Governor and General Assembly, the Department likewise stated, "The SASSI is especially effective in identifying early stage chemically dependent individuals who are either in denial or deliberately trying to conceal their chemical dependency pattern."[14] It found the SASSI to be effective even without the use of trained substance abuse counselors to administer it.[15] In light of the availability of effective screening mechanisms, such as the SASSI, the State cannot show that it will be harmed by the issuance of a preliminary injunction.

### 3. *Public Interest*

The last factor that must be evaluated is that of the public interest. "[P]erhaps no greater public interest exists than protecting a citizen's rights under the constitution." *Legal Aid Soc. of Hawaii v. Legal Services Corp.*, 961 F.Supp. 1402, 1419 (D.Hawai'i 1997). The Court, therefore, finds that this factor, too, weighs heavily in Plaintiffs' favor. Despite all of the good

intentions of the State of Michigan in enacting the Act,

> 'Experience should teach us to be most on our guard to protect liberty when the Government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding.'

*Chandler* at 322, 117 S.Ct. 1295, *citing Olmstead v. United States*, 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928).

### IV. *Conclusion*

All relevant factors weigh in favor of Plaintiffs and they have satisfied the requirements for the Court to enter a Preliminary Injunction in their favor. Therefore, and for all of the above reasons, **THE COURT HEREBY GRANTS** Plaintiffs' Motion for Preliminary Injunction [**document 24**] and enjoins Defendant from conducting suspicionless drug testing of FIP applicants or recipients, such a practice being an unconstitutional infringement of Plaintiffs' Fourth Amendment rights.

12. In Maryland, the applicants are asked four questions. Greg Garland, *Drug Abuser care Program Reaches Few,* The Baltimore Sun, November 28, 1999 at 1B, (Dft's Exh. 40). In New York, the case manager hands the applicants a nine-question paper test. Nina Bernstein, *City Searches Medical Files in Effort to Force Welfare Applicants Into Drug Treatment,* N.Y. Times, September 25, 1999, at A14, (Dft's Exh. 42).

13. LaDonna Pavetti, et. al., American Institutes for Research, *Welfare–to–Work Options for Families Facing Personal and Family Challenges: Rationale and Program Strategies* 23 (1987). This article is Plaintiffs' Exhibit O.

14. *Recipient Drug Testing Study* 4 (1998). This report is within Plaintiffs' Exhibit X.

15. *Also see* Letter from Linda G. Dilworth, Assistant Secretary for Economic Self–Sufficiency Services of Florida Department of Children & Families, to District Economic Self–Sufficiency Services Program Administrators 4 (Dec. 24, 1998) ("The [SASSI] establishes a scientific objective decision of 'reasonable cause' and may result in the applicant's being required to have a drug test."). This letter is within Plaintiffs' Exhibit X.